NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11749

COMMONWEALTH  vs.  JEREMY LIBBY.


Suffolk.     February 4, 2015. - June 26, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.


Constitutional Law, Admissions and confessions, Waiver of constitutional rights.  Practice, Criminal, Motion to suppress, Admissions and confessions, Voluntariness of statement, Waiver.  Waiver.  Evidence, Admissions and confessions, Voluntariness of statement.


Indictments found and returned in the Superior Court Department on July 31, 2012.

A pretrial motion to suppress evidence was heard by Mary-Lou Rup, J.

An application for leave to prosecute an interlocutory appeal was allowed by Lenk, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her.


Jane Davidson Montori, Assistant District Attorney, for the Commonwealth.
Marissa Elkins for the defendant.


CORDY, J.  The Commonwealth appeals from the ruling of a

Superior Court judge suppressing statements made to police

officers by the defendant during the course of two interviews: the first being prearrest and the second following his arrest. The defendant was advised of the Miranda rights at the commencement of both interviews, but, in various ways, those rights were not accurately explained. Among other things, we are required to consider the effect of the inaccurate explanation of those rights in a noncustodial setting on the voluntariness of statements made thereafter, and on the knowing, voluntary, and intelligent waiver of those rights in a subsequent custodial interrogation. We reverse the judge's ruling suppressing the prearrest statement, and affirm her ruling suppressing the postarrest statement.

Background. On June 27, 2012, members of the Palmer police department received a complaint regarding the sexual abuse of K.C., a six year old girl who resided in the home where the defendant was living. Shortly after police arrived at the home, the defendant voluntarily[1] accompanied them to the Palmer police station to discuss an allegation that he had inappropriately touched K.C. Sergeant Scott Haley was the only officer present during this conversation, and he began the interview by reading the defendant the Miranda rights. Haley then asked the

---

[1] The record does not state whether the defendant was driven to the police station or if he drove himself there. Sergeant Scott Haley's investigative report only notes that the defendant "willingly" went to the station.

defendant whether, with those rights in mind, the defendant was willing to talk "about these matters of concern." After a somewhat lengthy colloquy regarding the appointment of counsel and whether the defendant was under arrest, discussed infra, the defendant signed a Miranda waiver form and the interview proceeded. The defendant denied any inappropriate conduct with K.C. The interview concluded just after 10 P.M., and the defendant left the police station.

On June 28, 2012, Haley attended a forensic interview of K.C., during which she alleged that the defendant had sexually abused her. The defendant was subsequently arrested and brought to the police station. He was booked, fingerprinted, and brought back to the same interview room in which he had met with Haley the day before. Haley again read the defendant the Miranda rights, which the defendant waived in writing. After being told that additional evidence had been uncovered, the defendant again raised the issue of counsel. Ultimately, after another colloquy with Haley, the defendant said he did not want a lawyer at that time and the interview continued. The defendant proceeded to make inculpatory statements and admitted that the previous day, while he was tickling K.C., she had moved his hand to her inner thigh near her private parts.

Procedural history. In July, 2012, the defendant was indicted by a Hampden County grand jury on four counts of

forcible rape of a child in violation of G. L. c. 265, § 22A, as well as four counts of indecent assault and battery on a child under the age of fourteen in violation of G. L. c. 265, § 13B.

In April, 2013, the defendant filed a motion to suppress the statements he made to Sergeant Haley during both of his interviews. The Commonwealth filed a written opposition in response. At a hearing on the motion, the parties submitted digital video discs of the defendant's interviews; a stipulation as to the timeline of events; two signed Miranda waiver forms; a medical record of the examination of K.C., the complaining witness; and a police report authored by Haley. No testimony was taken. After a second, nonevidentiary hearing, the motion judge granted the defendant's motion to suppress in its entirety.

In her decision, the judge concluded that the June 27 interview was noncustodial, but expressed some uncertainty whether Miranda warnings given in a noncustodial interview had to be scrupulously honored under Massachusetts law. She further concluded that the Commonwealth failed to prove beyond a reasonable doubt that the defendant understood the full import of his right to counsel and that he had voluntarily, knowingly, and intelligently waived that right. The judge also concluded that reasonable doubt remained as to the voluntariness of the defendant's statements on June 27, given interruptions and

misstatements made by Haley. With respect to the defendant's June 28 interview, the judge held that misstatements by Haley created a fundamental misunderstanding as to the defendant's right to appointed counsel. This, coupled with repeated "clarifying" questions that may have dissuaded the defendant from exercising his right to counsel, hampered the Commonwealth from establishing, beyond a reasonable doubt, the validity of the defendant's waiver. Additionally, the motion judge found that the Commonwealth did not meet its burden of showing that the defendant's June 28 statements were voluntarily made in light of Haley's implicit offers of leniency in conjunction with misstatements about the defendant's right to counsel.

Subsequently, the Commonwealth filed a motion to stay proceedings in the trial court, with a notice of interlocutory appeal. The case is now before us pursuant to an order of a single justice allowing the Commonwealth's application for leave to pursue an interlocutory appeal.

Discussion. Typically, when "reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, 'but conduct an independent review of [her] ultimate findings and conclusions of law.'" Commonwealth v. Clarke, 461 Mass. 336, 340 (2012), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). "A judge who has seen and heard the witnesses is in a better position to determine their

credibility than is a court which is confined to the printed record." Commonwealth v. Novo, 442 Mass. 262, 266 (2004). However, "whenever the evidence before the trial court is reduced to a tangible form, and is therefore available to the appellate court in the same form as it was reviewed by the trial court," id., "the case for deference to the [motion] judge's findings of fact is weakened." Clarke, supra at 340. In such circumstances, "this court stands in the same position as did the [motion] judge, and reaches its own conclusion unaffected by the findings made by the [motion] judge" (citation omitted). Novo, supra at 266. Accordingly, we take "an independent view of the evidence and analyze[] its significance without deference" (citation and quotation omitted). Clarke, supra at 341.

We have previously held that "[t]he requirements of Miranda v. Arizona, 384 U.S. 436, 444 (1966), are not triggered unless the interrogation is custodial, and a defendant's failure to receive or understand Miranda warnings, or police failure to honor Miranda rights, does not result in suppression of a voluntary statement made in a noncustodial setting." Commonwealth v. Hilton, 443 Mass. 597, 608-609 (2005), S.C., 450 Mass. 173 (2007). "[T]he premise of Miranda [is] that the danger of coercion results from the interaction of custody and official interrogation." Illinois v. Perkins, 496 U.S. 292, 297

(1990). Accordingly, "[t]he safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest" (citation and quotation omitted). Commonwealth v. Kirwan, 448 Mass. 304, 309 (2007).

"Custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Id., quoting Commonwealth v. Jung, 420 Mass. 675, 688 (1995). "The determination of custody depends primarily on the objective circumstances of the interrogation, and not on the subjective views of either the interrogating officers or the person being questioned." Commonwealth v. Sneed, 440 Mass. 216, 220 (2003). Accordingly, "'[t]he crucial question' . . . is whether 'a reasonable person in the defendant's position would have believed that he was in custody.'" Commonwealth v. Molina, 467 Mass. 65, 73 (2014), quoting Commonwealth v. Baye, 462 Mass. 246, 253 (2012). Therefore, "if the defendant reasonably believed that he was not free to leave, the interrogation occurred while the defendant was in custody, and Miranda warnings were required" (citation omitted). Commonwealth v. Groome, 435 Mass. 201, 211 (2001).

Whether made in a custodial or noncustodial setting, and even where there has been a valid waiver of Miranda rights, we

must consider the voluntariness of a defendant's statement, as "a confession or an admission is admissible in evidence only if it is made voluntarily." Commonwealth v. Tremblay, 460 Mass 199, 206 (2011). "[T]he Commonwealth must prove beyond a reasonable doubt that 'in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was [not] overborne,' but rather that the statement was 'the result of a free and voluntary act.'" Baye, 462 Mass. at 256, quoting Commonwealth v. Durand, 457 Mass. 574, 595-596 (2010). "A voluntary statement is one that is the product of a rational intellect and a free will, and not induced by physical or psychological coercion." Molina, 467 Mass. at 75, quoting Tremblay, supra at 207.

The issue of voluntariness necessarily "turns on 'all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation.'" Baye, 462 Mass. at 256, quoting Dickerson v. United States, 530 U.S. 428, 434 (2000). "This is not an area of the law that is governed by bright-line rules, but is one that requires a fact-intensive analysis." Tremblay, 460 Mass. at 210. "Relevant factors [to this inquiry] include, but are not limited to, 'promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental

condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings.'" Molina, 467 Mass. at 76, quoting Commonwealth v. Selby, 420 Mass. 656, 663 (1995). While the "use of false information by police during an interrogation is deceptive and is a relevant factor indicating a possibility that the defendant's statements were made involuntarily," Novo, 442 Mass. at 267, quoting Selby, 420 Mass. at 664, "[m]isinformation by the police does not necessarily render a confession involuntary." Commonwealth v. Raymond, 424 Mass. 382, 395 (1997). "The presence of one or more factors suggesting a statement may have been made involuntarily is not always sufficient to render the statements involuntary." Tremblay, 460 Mass. at 207, quoting Selby, supra.

With these standards delineated, we turn to assessing the statements at issue and the judge's ruling.

1. June 27 statements. As noted, the defendant voluntarily accompanied the police to the police station on June 27, 2012, to discuss an allegation that he had inappropriately touched K.C. The defendant, who was not under arrest, sat with Haley in an office furnished with two chairs and a desk with a computer. The interview was videotaped with the defendant's knowledge and assent.

Haley began the defendant's interview by reading him the Miranda rights.  Haley then asked the defendant whether, with these rights in mind, he wanted to discuss the "matters of concern."  The following exchange ensued:

Defendant:   "I'm thinking with the circumstances I might need to get a lawyer."

Haley:   "Well, we can stop this right now if you want a lawyer."

Defendant:   "But where does that put me today?  Am I arrested?  Am I under arrest?"

Haley:   "Well, right now you're not under arrest."

Defendant:   "I understand that, but if -- I'm not refusing to answer, but I'm thinking.  I'm just thinking to myself underneath the circumstances, with what's being alleged right now."

Haley:   "Well, we haven't alleged anything with you right now."

Defendant:   "Well, the officer said that there was allegations against me for inappropriately touching my six year old daughter.[2]  That's what he said."

. . .

Haley:   "That's why you're in here.  That's what I'm here to interview you about, okay?"

Defendant:   "Okay."

Haley:   "So if you want a lawyer, we will stop the process right now and the interview ends, okay?  If you don't want a lawyer and you want to tell me your side of the story, then we'll continue

---

[2] Although the defendant and K.C. are not biologically related, the defendant considered K.C. to be his daughter given his past relationship with K.C.'s mother.

with the interview.  So that's the decision you have to make.  Whether or not you want to --"

Defendant:     "But if I stop, am I under arrest?"

Haley:         "You're not under arrest right now.  I'm going to talk to the sergeant as to the status of the investigation, and then we'll make a decision on that, okay?  But as of right now you're not under arrest, okay?"

Defendant:     "Okay.  Now, if I need the court to appoint me a lawyer because I do not have the funds?"

Haley:         "If we get to that point, okay, then the court will appoint you a lawyer at arraignment, okay?[3]  If we get to that point, but we're not to that point yet."

Defendant:     "Okay."

Haley:         "Okay?"

Defendant:     "I just --"

Haley:         "We're at the point of we're investigating these allegations, and you willingly came in here to talk to us about what happened --"

Defendant:     "Yes."

Haley:         "-- on your side, okay?"

---

[3] This was not a completely accurate statement of law under Miranda v. Arizona, 384 U.S. 436 (1966).  "[W]hile arraignment is one procedural step in criminal proceedings that will trigger the . . . right to counsel [under the Sixth Amendment to the United States Constitution], other steps occurring prior to arraignment may operate to initiate criminal proceedings and trigger those rights at an earlier stage," Commonwealth v. Torres, 442 Mass. 554, 570-571 (2004), including, of course, a custodial interrogation.  Nevertheless, as discussed infra, this statement was not directly material, as the defendant did not have a right to appointed counsel during his June 27, 2012, noncustodial interview.

Defendant:     "I'll waive the right, and if I need a lawyer afterwards then I'll just have to somehow -- I just don't want to -- I have a tendency, if something comes out the wrong way, I don't need that getting used."

Haley:         "Well, what we're going to do here now is we're going to put a written statement. . . . It's going to be your statement, okay?  And in that we're going to take the facts down, your side of the story about what happened here, alright?"

Defendant:     "Okay."

Haley:         "And then before we're done here, we read that statement back, and we correct anything that is not correct. . . .  It's your side, your statement, your side of the story.  I'm just recording the facts as you give them to me, okay?  So there isn't going to be stuff on here that you don't want to be on there, you know what I'm saying?  This is your statement of facts that you have to sign at the end.  Alright? . . .  So this is your chance to tell me, okay, what happened here.  So you're okay with that?"

Defendant:     "I'm fine with that.  But like I said, I honestly don't know what."

Haley:         "Well, you can stop talking at any time you want, okay?"

Defendant:     "Yes."

Haley:         "We can end the interview.  It says right here in your Miranda, right?"

Defendant:     "Yeah."

Haley:         "Alright.  So do you understand this Miranda?"

Defendant:     "Yes, I do."

Haley:         "Okay.  Do you want to talk to me now and waive your Fifth Amendment right?"

Defendant:    "Yes."

Haley:        "Yes, okay.  And you may -- and when you want to stop talking and you want to have a lawyer, then you can do that.  Is that what you're telling me?"

Defendant:    "Yes, yeah.  I just, like I said, I don't know."

The defendant then signed a waiver of the Miranda rights, and the interview proceeded.

After discussing some background information, Haley again mentioned, and the defendant acknowledged, that the defendant had received and understood the Miranda rights and that he was not under arrest.  When Haley asked the defendant, again, if he had waived the right to an attorney, the defendant responded, "I just don't exactly know.  Like I said, I don't know exactly what's being alleged here.  I don't know how to go about it. I'm not -- I don't want to put myself in any -- get myself in any trouble because of the way that I word something."  Haley responded, "Well, it's in a written statement form that we're going to read back, so there's like no trickery here.  You know what I'm saying?"  The defendant said he understood, and Haley repeated that if the defendant wanted an attorney present he could stop answering questions at any point.  The defendant acknowledged that he was not requesting a lawyer at that time. Haley asked the defendant if he was voluntarily giving his statement, to which the defendant replied in the affirmative.

The interview continued, and Haley and the defendant discussed the substance of the allegations.  Throughout the conversation, after typing a sentence or phrase, Haley would confirm with the defendant that he had accurately typed what the defendant said.  The defendant admitted he had spent brief periods of time alone with K.C., but denied any inappropriate conduct.  The defendant was given bottled water and took two unaccompanied bathroom breaks.  Throughout the interview, the defendant was articulate and responded appropriately to all questions.  Haley used a conversational tone and never raised his voice.  The interview lasted approximately one and one-half hours, and after it concluded the defendant left the police station.

a.  Custody.  The defendant argues that he was in custody during his June 27 interview and accordingly the statements he made were obtained in violation of the Fifth Amendment to the United States Constitution, art. 12 of the Massachusetts Declaration of Rights, and Miranda, 384 U.S. at 476.  He also argues that his statements on this date were, as the judge concluded, not voluntary.  In response, the Commonwealth contends that the defendant's June 27 statements should not be suppressed because Miranda does not apply to noncustodial interviews, the defendant only made an equivocal request for counsel, and his statements were made voluntarily.

We begin our analysis by agreeing with the motion judge that the defendant was not in custody on June 27. While some factors in the custody analysis weigh against the Commonwealth, they are not conclusive. For example, "the fact that the focus of the investigation was on the defendant," Commonwealth v. Barnes, 20 Mass. App. Ct. 748, 752 (1985), and "[t]he fact that the defendant's interview occurred at the police station [are] not, by [themselves], dispositive." Hilton, 443 Mass. at 609-610. While a police station is not an entirely neutral setting, the defendant went there voluntarily and was expressly told several times that he was not under arrest. Moreover, while Haley explained to the defendant the focus of his questioning and revealed some degree of suspicion, on that date his general demeanor indicated that the "exchange was explanatory rather than accusatory." Molina, 467 Mass. at 74. See Hilton, 443 Mass. at 608-611 (noncustodial interrogation where officers "stopped short of an outright accusation"). Whether an investigation has begun to focus on a suspect is "material to the custody inquiry only to the extent that an officer's suspicions influence the objective conditions of an interrogation, such that a reasonable person in the position of the person being questioned would not feel free to leave the place of questioning." Commonwealth v. Morse, 427 Mass. 117, 124-125 (1998). To whatever extent the interview may have led a

reasonable person to think he or she was not free to leave, "any such mistaken impression was dispelled by [Haley's] correct explanation of the defendant's actual status." Groome, 435 Mass. at 215.

Of chief significance here is that the defendant went to the police station voluntarily, see Molina, 467 Mass. at 73, and, once there, was told numerous times that he was not in custody. Both Haley and the defendant sat in a relaxed fashion. There is no evidence to suggest that the defendant's freedom to leave the interview was restricted at any time, and he took two unaccompanied bathroom breaks. Haley asked all questions in a conversational tone and never raised his voice. Moreover, the flow of the exchange was predominantly influenced by the defendant's own remarks. When the interview was over, the defendant left the police station without hindrance. While a reasonable person in the defendant's position may have believed that he was a suspect in the investigation, these circumstances do not demonstrate an environment "so dominated by the police that a reasonable person would perceive that his liberty was restrained to a degree associated with a formal arrest." Kirwan, 448 Mass. at 312.

Given our conclusion that the defendant was not in custody on June 27, his interview on this date was simply not governed by Miranda. Therefore, because his "inquiry about an attorney

occurred at a point well prior to the commencement of any custodial interrogation," Groome, 435 Mass. at 216, he did not effectively invoke a "right" to counsel. "The fact that the defendant was read his Miranda rights when he arrived at the station may be understood to be only a step taken in an abundance of caution." Barnes, 20 Mass. App. Ct. at 752. While "[w]e have 'encouraged police to give Miranda warnings prior to the point at which an encounter becomes custodial,'" Baye, 462 Mass. at 263, quoting Hilton, 443 Mass. at 610 n.7, "[t]he requirements of [Miranda] are not triggered unless the interrogation is custodial." Baye, supra at 253, quoting Hilton, supra at 608. See generally Groome, 435 Mass. at 215-216. Therefore, the interview not being custodial, the defendant's musings about perhaps needing a lawyer, and his inquiry about how to get the court to appoint him a lawyer if he could not afford one, did not require the officer to cease all questioning, and did not render his June 27 statements inadmissible under Miranda. See Barnes, supra.[4]

---

[4] Many other States have similarly held that a suspect's expressed desire to consult with an attorney, when voiced in a noncustodial setting, does not entitle the suspect to the protections of Miranda or require that police officers cease questioning, even when the suspect has been given Miranda warnings. See, e.g., State v. Middleton, 220 W. Va. 89, 98-99 (2006), overruled on other grounds by State v. Eilola, 226 W. Va. 698 (2010) (request for counsel during noncustodial interview did not invoke protections of Miranda so as to preclude further questioning even though Miranda rights given).

b.  Voluntariness of the statements.  "Where a defendant makes statements to the police while 'not in custody, we focus solely on the question whether his statements were voluntary.'" Molina, 467 Mass. at 75, quoting Durand, 457 Mass. at 595.  The defendant argues that his statements on June 27 were not made freely or voluntarily and should therefore be suppressed.  The Commonwealth counters that, given the totality of the interview's circumstances, the defendant's statements were voluntary and we should reverse the motion judge's order of suppression.  We conclude that the Commonwealth has met its burden of establishing that the defendant's June 27 statements were voluntary beyond a reasonable doubt.

"[W]here the police provide precustodial warnings but then ignore the defendant's attempts to avail himself of those rights, the 'coercive effect of continued interrogation [is] greatly increased because the suspect [could] believe that the police "promises" to provide the suspect's constitutional rights were untrustworthy, and that the police would continue to'

See also State v. Stanley, 167 Ariz. 519, 525, cert. denied, 502 U.S. 1014 (1991) (same); Zook v. State, 513 N.E.2d 1217, 1218-1221 (Ind. 1987) (same); Hunt v. State, 687 So. 2d 1154, 1158-1160 (Miss. 1996) (same); State v. Carpentier, 132 N.H. 123, 127-128 (1989) (same).  Accord State v. Haddock, 257 Kan. 964, 976-977 (1995), abrogated on other grounds by State v. James, 276 Kan. 737, 750-751 (2003).  Quite simply, the constitutional rights that Miranda safeguards do not exist outside the context of custodial interrogation, and providing a suspect with Miranda warnings "does not transform a noncustodial interrogation into a custodial interrogation."  Haddock, 257 Kan. at 976-977.

ignore subsequent invocations, rendering such invocations futile." Baye, 462 Mass. at 263, quoting Tukes v. Dugger, 911 F.2d 508, 516 n.11 (11th Cir. 1990), cert. denied sub nom. Singletary v. Tukes, 502 U.S. 898 (1991). However, the totality of the circumstances of the defendant's June 27 statement was not sufficiently coercive to render his statements involuntary. Put another way, based on the record before us we cannot say that the will of the defendant was overborne.

The defendant's June 27 statements appear to be the result of free and voluntary acts, as the interview techniques employed by Haley were not so unfair or oppressive as to deprive the defendant of his rational intellect. The interview was reasonable in length, lasting approximately one and one-half hours. See Commonwealth v. O'Brian, 445 Mass. 720, 728, cert. denied, 549 U.S. 898 (2006). Haley neither minimized the seriousness of the allegations the defendant faced nor made the defendant any promises. See, e.g., Baye, 462 Mass. at 257; Tremblay, 460 Mass. at 208-210; Sneed, 440 Mass. at 222. Haley did not engage in any trickery and this was not a case in which the police obtained a confession by materially misrepresenting the defendant's fundamental constitutional rights. Contrast Baye, 462 Mass. at 246, 256-260 (statement involuntary where officers engaged in "multiple improprieties" and employed deceptive tactics during ten-hour interrogation). Nor did he

tell the defendant that this conversation was his sole opportunity to tell his story, that the strength of the evidence against the defendant was stronger than it was, or that he would charge the defendant with more serious crimes if the defendant did not confess. Contrast Novo, 442 Mass. at 264-270 (statement involuntary where police officers repeatedly said interview was only chance for defendant to tell story).

The defendant was twenty-eight years of age, and while he appeared upset and nervous at points, there was no reason to question his mental capacity. Throughout the interview, the defendant appeared sober, alert, and lucid. He was coherent and articulate, and he consistently demonstrated his understanding of the nature of the interview. See Molina, 467 Mass. at 77. Given the defendant's reference to a prior charge of operating while under the influence of alcohol, it was reasonable to infer that he had some prior experience with law enforcement officers and the court system. Significantly, the defendant's statements appeared to be the product of his own free will. He directly answered all questions and provided "exculpatory explanation[s] of events . . . indicating an awareness of the consequences of . . . speaking to the police." Commonwealth v. Beland, 436 Mass. 273, 281 (2002). See Durand, 457 Mass. at 597 (defendant's statement voluntary where "able to decide what to tell the officers").

It is true that Haley provided the defendant with seemingly conflicting information with regard to obtaining appointed counsel. First, in the Miranda warnings, Haley advised the defendant that he had the right to an attorney (inferably at the interview), and that if he could not afford an attorney, one would be appointed for him. And, later, when the defendant asked whether if he needed a lawyer the court would appoint him one because he did not have the funds, Haley told him, "the court will appoint you a lawyer at arraignment" "if we get to that point." However, it does not appear that this conflicting advice coerced the defendant into making a statement. The defendant was consistently told that he did not have to say anything and could stop speaking at any time. Haley never suggested that he did not need a lawyer, and the defendant never unequivocally declared that he wanted one, only to be told that he could not have one.

Where the defendant had no right to appointed counsel because his interview was noncustodial and no legal proceedings had been initiated against him, Haley's statements cannot be construed to be "so manipulative . . . that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to [speak]" (citation omitted). Baye, 462 Mass. at 256. As "there is simply nothing about the interview . . . that suggests the defendant's will was overborne in any way," Molina,

467 Mass. at 76, the totality of the circumstances supports the conclusion that the defendant's June 27 statements were voluntary.

2. June 28 statements. On June 28, 2012, at approximately 12 P.M., Haley attended the forensic interview of K.C. at the Family Advocacy Center in Springfield, in which she alleged that the defendant had sexually abused her. Thereafter, at approximately 1:30 P.M., the defendant was arrested at the Palmer Division of the District Court Department where he was attending a restraining order hearing.

At the police station, the defendant was booked and fingerprinted. He met with Haley in the same room as the day prior. At the start of the interview, Haley read the defendant the Miranda rights, which the defendant waived in writing. Appearing disheveled and tired, the defendant said he had spent the prior night "in [his] truck" and later said he had not slept.

Haley then told the defendant that the police had uncovered additional evidence since the prior day and now knew that information the defendant had recounted was not true. He told the defendant that the police were positive "some stuff" had been going on with K.C., and that the defendant was the one doing "these things." Haley asked the defendant to describe a "tickle game" that he played with his daughter. Regarding the

defendant's previous denials, Haley said, "[w]e're way beyond that now," and explained that he wanted to know what the defendant was "going to take ownership of."

At this point, the following exchange took place:

Defendant: "I think with these questions I might need a lawyer.  I don't know exactly what to say."

Haley:     "Well, I'll stop any minute for a lawyer for you, okay?  If that's what you want me to do.  This is your opportunity to say what's going on here, okay?  This is your opportunity to say what you want.  I'll stop.  If you want a lawyer, I will shut this thing off right now and leave.  Okay.  You tell me what you want to do.  You tell me."

Defendant: "Nothing's happened with the tickle thing.  Nothing's progressed.  Nothing -- I haven't done anything to her."

Haley:     "My question is do you want a lawyer or do you want to stop right now?"

Defendant: "How long would it take to get a lawyer here or an attorney?"

Haley:     "Well, they don't just come running out and sit in an interview, okay?  If you want a lawyer, then I'll stop the interview and you'll have a right to call an attorney all you want.  I'll go on my merry way and do other things."

Defendant: "What happens to me at that point?  Am I locked up?"

Haley:     "I'm going to be up front with you.  You're locked up right now, okay?  When you're fingerprinted and booked and told you're under arrest, you're locked up, okay?"

Defendant: "I understand that."

Haley: "I'm up in the air right now as to what criminal charges I'm going to be bringing against you, okay? Those are some of the reasons why I wanted to talk to you and get your side of the story, okay? As to what actual criminal charges I'm going to be bringing against you, you know. There's things here that you can do for yourself. But the first issue we have to get by here right now is whether you want to continue to talk to me or whether you want a lawyer. If you want a lawyer, I'll stop, okay? But you've got to make your mind up for me."

Defendant: "I want to get this straightened up and I want to do it the right way, but I don't -- I don't know exactly."

Haley: "Well, I've been fair with you. . . . But my protocol is I'm right up front with you. I'm not here to talk you out of a lawyer. I'm here to advise you to have a lawyer, you have the right to a lawyer, and if you want if you want to stop the interview and have a lawyer, I will do that right now. But you've got [to] make your mind up for me . . . , okay?"

Defendant: "I need -- can you tell me what's going to happen to me after this? Do I get bailed? Do I go -- I mean, what measures do I need to take to, you know, find out, to make arrangements to figure out, you know, how I'm?"

Haley: "Well, I think I just mentioned to you that you're already under arrest."

Defendant: "Yes."

Haley: "And I'm still -- it's still pending with me on what criminal charges I'm going to bring against you. That's like one of the main reasons why you're here today for me to interview you, okay? . . . You are already under arrest, okay? Already under arrest. You know, we have a protocol which is when you clearly, distinctly say, 'I want a lawyer, and don't want to go any further,' that we stop. But see, you don't really say that. You say, well, is this the

point where I might want a lawyer if this is happening.  If that's what you want, then I will just shut it down and leave, okay?  That's not a problem either . . . ."

Defendant: "This is not what -- I'm not trying to be an ass."

Haley:      "I know that.  I know you're not trying to be an ass. . . .  Very simply and equitably, right now, okay, we're on an interview here with the thing showing.  Do you want to stop the interview and have a lawyer or do you want to talk to me for a while longer?"

Defendant: "I'll try to talk to you for a little while longer."

Haley:      "So right now you do not want a lawyer?"

Defendant: "No."

During the ensuing interview that lasted less than one hour, Haley told the defendant, "we have clear-cut evidence that certain things happened here with this six year old, with you." Haley also told the defendant a few times that the police either knew K.C. had "been penetrated" or that they had "some indication that she's been getting penetrated."  The defendant made several incriminating statements, and admitted that while tickling K.C. on the previous day, she moved his hands to her inner thigh near her private parts.

In contrast to his June 27 interview, the defendant's June 28 interview was clearly custodial.  He had been arrested, booked, and fingerprinted.  Additionally, Haley explained to the

defendant several times that he was under arrest and "locked up."

The defendant argues that his June 28 statements should be suppressed because his Miranda waiver was invalid and Haley failed to cease questioning after the defendant invoked his right to counsel. The Commonwealth contends that the defendant validly waived the Miranda rights on June 28 and that Haley was entitled to continue questioning where the defendant did not unequivocally invoke his right to counsel.

"[A]fter a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Commonwealth v. Santos, 463 Mass. 273, 285 (2012), quoting Davis v. United States, 512 U.S. 452, 461 (1994). "To invoke the right to counsel, 'the suspect must unambiguously request counsel.'" Commonwealth v. Morganti, 455 Mass. 388, 396-397 (2009), S.C., 467 Mass. 96 (2014), quoting Davis, 512 U.S. at 459. If a suspect makes reference to counsel in an ambiguous or equivocal manner such that "'a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel,' the police questioning need not cease" (emphasis in original). Id. at 397, quoting Davis, supra. Our precedent requires police to "'honor a decision of a person in custody to cut off questioning,' and

prohibits such practices as 'refusing to discontinue the interrogation upon request' or 'persisting in repeated efforts to wear down [the defendant's] resistance and make him change his mind.'" Commonwealth v. Brum, 438 Mass. 103, 111 (2002), quoting Michigan v. Mosley, 423 U.S. 96, 105-106 (1975).

The defendant's reference to counsel during his noncustodial June 27 interview did not preclude the resumption of questioning on June 28. Contrast Maryland v. Shatzer, 559 U.S. 98, 110 (2010) (custodial invocation of right to counsel followed by break in custody requires period of fourteen days before police may resume questioning); Commonwealth v. Thomas, 469 Mass. 531, 545-548 (2014). Moreover, the defendant's two direct references to counsel during the June 28 interview, after signing the Miranda waiver form, were equivocal. First, he said, "I think with these questions I might need a lawyer. I don't know exactly what to say." Then, after being told by Haley, "This is your opportunity to say what's going on here . . . . If you want a lawyer I will shut this thing off right now and leave," the defendant subsequently asked, "How long would it take to get a lawyer here or an attorney?" These remarks, as well as the defendant's ambiguous responses to Haley's direct lawyer-related questions, were not unequivocal refusals to speak until the defendant had an opportunity to confer with counsel. See, e.g., Commonwealth v. Vincent, 469

Mass. 786, 793, 796-797 (2014) (statement not suppressed where defendant asked officers whether he "should get a lawyer" and said, "I think I might need [a lawyer]," and continued volunteering information about incident); Morganti, 455 Mass. at 397-398 (defendant's statement, "thinking I might need a lawyer and want to talk with him before talking to you," ruled too ambiguous to constitute unequivocal invocation of right to counsel).[5]

The motion judge concluded, however, that when coupled with Haley's suggestion the day before that the defendant could only have a lawyer appointed for him by the court "at arraignment," Haley's response to the defendant's question about "[h]ow long" it would take to "get a lawyer here," specifically that the defendant had "a right to call an attorney all you want," and "they don't just come running out and sit in an interview," "effectively precluded [the defendant] from understanding his

---

[5] See also Commonwealth v. Dubois, 451 Mass. 20, 25-26 (2008) ("[m]aybe I better get a lawyer" not unequivocal request); Commonwealth v. Jones, 439 Mass. 249, 258 (2003) ("going to need a lawyer sometime" not affirmative request for counsel); Commonwealth v. Peixoto, 430 Mass. 654, 657-658 (2000) (statements not suppressed where defendant only expressed uncertainty whether he wanted to speak to police without attorney); Commonwealth v. Todd, 408 Mass. 724, 726 (1990) (not affirmative request for counsel where defendant "wondered aloud about the advisability of having a lawyer"); Commonwealth v. Corriveau, 396 Mass. 319, 331 (1985) ("[i]t's beginning to sound like I need a lawyer" not affirmative request for counsel); Commonwealth v. Pennellatore, 392 Mass. 382, 387 (1984) ("I guess I'll have to have a lawyer for this" not affirmative request for counsel).

ability to exercise his right to counsel" at the custodial interview and, further, raised serious doubt that the defendant's waiver of his right to counsel was done knowingly, voluntarily, and intelligently.

We agree. "In order for a waiver to be 'knowing' and 'intelligent,' the defendant must understand 'the [Miranda] warnings themselves.'" Hilton, 443 Mass. at 606, quoting Raymond, 424 Mass. at 393. Where "the defendant manifestly did not understand the meaning of one or more of the rights described in the Miranda warnings, the Commonwealth cannot meet its burden of proving a valid waiver beyond a reasonable doubt." Commonwealth v. Hoyt, 461 Mass. 143, 153 (2011). Haley's statements that the right to appointed counsel does not attach until arraignment, that lawyers "don't just come running out and sit in an interview," and that the defendant would have to "call" a lawyer puts into question whether, having no funds to hire counsel, the defendant believed speaking with an attorney before speaking to the police was an actual possibility. That this fundamental misunderstanding went uncorrected hampers the Commonwealth in establishing, beyond a reasonable doubt, the validity of the defendant's waiver of his right to consult with counsel. See Clarke, 461 Mass. at 351 n.12. Therefore, the

motion judge properly suppressed the defendant's June 28 statements.[6]

Conclusion. The suppression of the defendant's June 27 statements is reversed, and the suppression of the defendant's June 28 statements is affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.

---

[6] Having concluded that the judge properly suppressed the defendant's statements because the Commonwealth had not established a valid waiver, we need not consider whether the statements made were also involuntary.