LUGO, COMMONWEALTH vs., 102 Mass. App. Ct. 170

 
 COMMONWEALTH vs. KATHYANA LUGO (and a companion case [Note 1]).

102 Mass. App. Ct. 170
 September 12, 2022 - January 18, 2023

Court Below: Superior Court, Hampden County
Present: Desmond, Sacks, & D'Angelo, JJ.

 

Nos. 21-P-881 & 21-P-882.

Practice, Criminal, Motion to suppress, Admissions and confessions. Constitutional Law, Admissions and confessions. Evidence, Admissions and confessions. Search and Seizure, Fruits of illegal arrest.

A Superior Court judge erred in denying the pretrial motions of two criminal defendants (charged with willful interference with a criminal investigation, in violation of G. L. c. 268, § 13B) to suppress statements they made to police in the early morning concerning a shooting that had occurred a few hours before, where the statements were obtained as a result of the unlawful seizure of the defendants and ensuing, closely connected custodial interrogation and accordingly should have been suppressed as fruits of the poisonous tree, in that the defendants remained in custody notwithstanding the removal of their handcuffs and their transportation to the police station by another officer in an unmarked vehicle (an issue that the Commonwealth did not raise and on which the judge should have refrained from basing her order without first affording all parties an opportunity to respond) [175-177]; in that, considering all of the circumstances, a reasonable person in either defendant's position would have believed that she remained in custody during the interrogation [177-180]; and, finally, in that the Commonwealth failed to establish that the statements were sufficiently attenuated from the underlying illegality of the defendants' custody, given that the removal of the handcuffs and the transport in an unmarked vehicle for interrogation at the police station were not sufficiently distinguishable from being handcuffed and held in a marked cruiser for nearly an hour to have purged the primary taint of that initial unlawful arrest, and given that the police misconduct was committed expressly to acquire the statements, and the conduct, more importantly, constituted a protocol of the police department that promoted unconstitutional investigative detentions [180-182].

Indictments found and returned in the Superior Court Department on June 11, 2019. 

 Pretrial motions to suppress were heard by Jane E. Mulqueen, J. 

 Page 171 

 Applications for leave to prosecute interlocutory appeals were allowed by Scott L. Kafker, J., and Dalila Argaez Wendlandt, J., in the Supreme Judicial Court for the county of Suffolk, and the appeals were reported by them to the Appeals Court.

 Roy H. Anderson for Kathyana Lugo.

 Joseph N. Schneiderman for Jesmillie Perez.

 Aileen S. Kim (Katherine E. McMahon, Assistant District Attorney, also present) for the Commonwealth.

 DESMOND, J. The defendants, Kathyana Lugo and Jesmillie Perez, each stand indicted on separate, single counts of willful interference with a criminal investigation. See G. L. c. 268, § 13B. A Superior Court judge denied their motions to suppress statements they made to police in the early morning concerning a shooting that occurred a few hours before. The judge, despite agreeing that the defendants had been illegally seized and functionally arrested, ruled sua sponte that the taint of that illegality had dissipated by the time the defendants had been transported to the police station and interrogated. The defendants' applications for interlocutory appeals were allowed by single justices of the Supreme Judicial Court. Because we conclude that the defendants remained in custody throughout their interactions with the police and that no attenuation dissipating the taint of those seizures occurred, we reverse.

 Background. "We recite the facts as found by the motion judge, supplemented by certain undisputed facts and by our own viewing of" video recordings of both the interrogations and surveillance footage. Commonwealth v. Baye, 462 Mass. 246, 247 (2012). We also supplement those findings with facts drawn from the police officers' testimony, which the judge implicitly credited. See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

 At approximately 1:47 A.M. on April 14, 2019, the Springfield police department received information that shots had been fired and an officer was down at a local nightclub. There were also reports of a "light-colored" sport utility vehicle (SUV) leaving the scene.

 At approximately 2 A.M., security from the nearby hospital alerted police that a white SUV had arrived at the hospital with three occupants, one of whom had gunshot wounds. Officer James Kelly, who had been working a police detail nearby, responded to the hospital. On arrival, Kelly observed bullet holes and blood on the SUV. He learned that two women, the defendants, had arrived with the gunshot victim.

 Page 172 

 Kelly, wearing a bright yellow police jacket with a visible badge, approached the defendants in the hospital's emergency room (ER) waiting area and collected their names, dates of birth, and telephone numbers. The defendants indicated that they had come from the nightclub and their friend, Emmanuel Adorno, had been shot in the nearby parking lot. After speaking to the defendants, Kelly took no further action. The defendants were allowed to remain, unaccompanied, in the ER waiting area, where they can be observed on the hospital's surveillance video recording making telephone calls, washing up, and conversing privately.

 After hearing that the family of the injured officer -- who was also brought to this hospital -- would soon be arriving, Kelly and two other officers handcuffed both of the defendants in the ER lobby, escorted them outside, and placed them in the back of a locked, caged police cruiser for approximately one hour both for "their safety and security" and because Kelly had also determined that the police "needed to have a longer conversation" with them. Kelly told the defendants that they were not under arrest and were "merely being detained until we sorted everything out." He further informed them that they were being detained "merely for safety and security." [Note 2] He testified that the handcuffing and placement in the marked cruiser of the defendants, whom he considered "[p]otential witnesses," was "protocol for . . . an investigation." When asked about this protocol, Kelly testified, "I couldn't give you the exact section and verse. However, that is how things have been done with several investigations." When asked if he had previously done this with potential witnesses, he testified, "I've done it several times before." Kelly also confirmed that the defendants "were taken to the police station by [his] decision alone, not their acquiescence." 

 Another officer, Detective Timothy Martin, arrived at the hospital to transport the defendants to the police station for their statements approximately one hour after the defendants had been placed in the locked cruiser. The defendants were still in the cruiser when Martin arrived. Martin did not see the defendants in the cruiser, and they were not handcuffed when he observed them 

 Page 173 

standing outside of the cruiser. [Note 3] He testified that they appeared "shaken up." In addition to Kelly and Martin, other uniformed officers also stood around the defendants. Martin testified that the defendants were "directed" into his unmarked cruiser. [Note 4] Based on the officers' testimony, it is apparent that the defendants were directed into Martin's unmarked vehicle within less than ten minutes of their being unhandcuffed and removed from the marked cruiser. When asked how the defendants entered his vehicle, Martin testified, "They may have [opened the door themselves] or I may have been a gentleman and opened it. I don't know." He did not handcuff them, take their belongings, or pat frisk them; however, he did not recall whether he asked the defendants if they wanted or were willing to go to the station in his vehicle or if he informed them that they could leave.

 At the police station, Martin escorted the defendants inside through the employee entrance [Note 5] to a second-floor hallway, where they were directed to sit on separate benches at opposite ends of the hallway "so that [the defendants could] not confer[] or speak[] about each other's perspective that could sway their own." At some point, each defendant separately used a restroom. For reasons unclear from the record, the defendants were directed to use the men's restroom. While each defendant was in the restroom, a police officer stood outside the door.

 A detective, Daniel Reigner, took statements from both defendants separately. [Note 6] He did not administer Miranda warnings to either defendant because he did not consider them suspects or 

 Page 174 

under arrest. He did not tell them that they were free to leave or that they did not have to answer his questions because "they never asked." He did not advise them that they could leave if they so wished. The questions Reigner asked the defendants included whether Adorno had a gun or fired a gun, whether there was a gun inside the defendants' SUV, whether anyone else had been in the SUV, and whether the SUV had made any other stops and, if so, exactly where those stops occurred. After questioning, as Reigner and Perez were leaving the interview room, Perez "asked [Reigner] something to the effect of if she was going to be in trouble or if it was going to show up on" a criminal offender record information (CORI), at which point Reigner laughed and told her she was just a witness and that "we're going to get you out of here as soon as we're done." After the interviews, Martin transported both defendants home in his unmarked cruiser. 

 A little over one month after the shooting, each defendant was indicted on a single charge of willful interference with a criminal investigation based on the substance of the interviews and Reigner's later viewing video surveillance of the scene of the shooting.

 The defendants filed motions to suppress their statements, and an evidentiary hearing took place. The Commonwealth argued that the tense circumstances at the hospital justified the detention of the defendants for their own safety and, therefore, no custodial interrogation occurred; the defendants argued that they were in custody from the time they were handcuffed until after their statements were taken.

 The judge denied the motions and issued an essentially identical written memorandum of decision in each case. She concluded, and we agree, that Kelly's handcuffing and placement of the defendants in the locked cruiser, without reasonable suspicion or probable cause, violated the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. Nevertheless, the judge then concluded that the statements did not need to be suppressed, because the connection between that initial detention at the hospital and the later statements at the police station had become "so attenuated as to dissipate the taint." [Note 7] Specifically, she determined that the removal of the handcuffs and transportation of the defendants to the 

 Page 175 

station in an unmarked police car constituted intervening events, and the officer's conduct was not intended to flout the requirements of the Fourth Amendment.

 Discussion. "Absent clear error, we accept and adopt the findings of the motion judge, but we 'independently determine the correctness of the judge's application of constitutional principles to the facts as found.'" Commonwealth v. Narcisse, 457 Mass. 1, 5 (2010), quoting Commonwealth v. DePeiza, 449 Mass. 367, 369 (2007). Because the judge correctly concluded that the encounter between the defendants and Kelly escalated into an illegal seizure when Kelly placed them in handcuffs, we begin our analysis after the defendants were released from the handcuffs and from Kelly's marked, locked cruiser. We first examine whether the defendants were in custody when they were directed into the unmarked cruiser and taken to the police station, then whether they were in custody when they were taken into the station and interrogated, and finally whether anything in that chain of events sufficiently dissipated the taint of the initial illegal seizure as to trigger the attenuation doctrine.

 1. Custody. Article 14 of the Massachusetts Declaration of Rights provides that "[e]very subject has a right to be secure from all unreasonable searches, and seizures, of [her] person." A person is seized in the constitutional sense when "an officer has, through words or conduct, objectively communicated that the officer would use his or her police power to coerce that person to stay." Commonwealth v. Matta, 483 Mass. 357, 362 (2019). The Commonwealth bears the burden of establishing that evidence obtained following an unconstitutional seizure is not "fruit of the poisonous tree" where the primary illegality has been established (citation omitted). Commonwealth v. Tavares, 482 Mass. 694, 707 (2019). Where an arrest without probable cause produces a statement by the arrestee, "well-established precedent requires suppression of the [statement] unless that [statement] was 'an act of free will [sufficient] to purge the primary taint of the unlawful invasion'" (citations omitted). Commonwealth v. Melo, 472 Mass. 278, 298 (2015). Because the Commonwealth cannot carry its burden on this record, we agree with the defendants that the statements must be suppressed. 

 a. Removal of handcuffs and transport to police station. The Commonwealth did not argue before the motion judge that the unconstitutionality of the defendants' seizure at the hospital was attenuated in any fashion from their statements at the police 

 Page 176 

station. The motion judge sua sponte introduced this issue. The Commonwealth now argues that a motion judge preserves an unraised issue where the issue was amply explored below and the judge addressed it, see Commonwealth v. Vargas, 475 Mass. 338, 343 n.7 (2016), and that a motion judge is "permitted to decide the motion to suppress on any ground supported by the evidence," Commonwealth v. Tyree, 455 Mass. 676, 683 n.18 (2010). While both principles are accurate, here, however, it is undisputed that the issue was not amply explored below. To be sure, the better practice would have been to allow the parties to brief the theory before issuing a decision based on that theory. See id. (rejecting defendant's challenge to judge's request for supplemental briefing on theory not raised by Commonwealth at hearing); Commonwealth v. Bettencourt, 447 Mass. 631, 634 (2006) ("Trial judges cannot be expected to rule, and indeed should not, on theories not presented to them, and defendants cannot respond to arguments not made at the trial level"). The judge should have refrained from basing her order on an issue the Commonwealth did not raise, without first affording both parties an opportunity to respond. See Bettencourt, supra.

 Notwithstanding that the Commonwealth neither relied on nor argued a theory of attenuation below, the judge concluded that the removal of the handcuffs and the defendants' transfer to the police station in an unmarked vehicle constituted intervening circumstances that attenuated the impact of the earlier seizure, making all subsequent statements voluntary and thus admissible. In turn, the defendants argue that the circumstances surrounding their release from Kelly's marked cruiser and the transport in Martin's unmarked vehicle instead show continued custody. We agree with the defendants.

 In a footnote, the judge reasoned that the removal of the handcuffs equated to a release from custody. To be clear, Kelly did not testify as to the act of removing the defendants' handcuffs. Martin testified that he never saw the defendants in the back of the marked cruiser or in handcuffs. When Martin encountered the defendants, they stood outside the cruiser but were still surrounded by a number of uniformed officers. Given the lack of testimony on the specific circumstances surrounding the removal of the handcuffs, this fact alone is not a significant intervening circumstance. Cf. Commonwealth v. Lopes, 455 Mass. 147, 162-163 (2009) (defendant "not in custody after his handcuffs were removed and he was told he was not under arrest" and where 

 Page 177 

officers asked "whether he would be willing to stay and wait . . . to speak to Boston police"). According to a surveillance video recording, the defendants were handcuffed and placed in the back of the marked cruiser at approximately 2:06 A.M. and remained there for approximately one hour, until they were uncuffed and escorted to the unmarked vehicle. Likewise, according to the video, Martin's vehicle then left the hospital parking area at 3:07 A.M. Thus, it is undisputed that little to no time elapsed between when the defendants were released from the marked cruiser and transferred to Martin's vehicle. 

 The circumstances surrounding the transport of the defendants to the police station -- while more detailed -- fare no better. The evidence is uncontested that Martin did not offer the defendants any alternative, such as arranging their own ride or coming to the station later in the morning after they'd gotten some rest, to his taking them to the station. The defendants were told when they were directed into Martin's unmarked cruiser that "[t]hey were being taken [to the police station] for a statement as a witness." In directing the defendants toward Martin's vehicle and conveying that they could leave after giving their statements, the officers "had objectively communicated that [they] would use [their] police power to compel the defendant[s] to stay" until such statements were taken. Commonwealth v. Chin-Clarke, 97 Mass. App. Ct. 604, 608 (2020). See Melo, 472 Mass. at 297 (defendant's "involuntary transport and detention for interrogation purposes amounted to a 'seizure' for Fourth Amendment purposes and became the functional equivalent of an arrest"); Commonwealth v. Pinney, 97 Mass. App. Ct. 392, 400 (2020) ("These circumstances, viewed objectively, require a conclusion that the defendant was effectively under arrest when he was detained at scene, handcuffed, and transported to the police station"). Therefore, notwithstanding the fact that the defendants' handcuffs were removed and they were transported to the station by another officer in an unmarked vehicle, they remained in custody.

 b. Custodial interrogation. We next examine whether the defendants remained in custody once they arrived at the police station and were interrogated. Although we use the framework designed to determine whether an interrogation was custodial for Miranda purposes, our focus here is not on the absence of Miranda warnings but instead on the defendants' custodial status. [Note 8] 

 Page 178 

"'The determination of custody depends primarily on the objective circumstances of the interrogation,' that is, 'whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that [she] was in custody.'" Commonwealth v. Woollam, 478 Mass. 493, 506 (2017), cert. denied, 138 S. Ct. 1579 (2018), quoting Commonwealth v. Sneed, 440 Mass. 216, 220 (2003). Considering all of the circumstances, a reasonable person in either defendant's position here would have believed that she remained in custody. [Note 9] The factors we consider in determining whether the defendants were in custody include

"(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."

 Page 179 

Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001). These factors "provide a framework" of relevant circumstances, but a court must still consider "all of the circumstances that shed light on the custody analysis." [Note 10] Commonwealth v. Medina, 485 Mass. 296, 301 (2020).

 Here, we conclude that the defendants remained unlawfully in custody when Reigner questioned them. They were brought to the police station for their statements in the middle of the night. While the judge noted that their entrance into the building was through the employee entrance rather than the one typically used for individuals in custody, we see no meaningful difference that an individual who may have been unfamiliar with the formal booking process would have appreciated. While it is true that "[t]he fact that the defendant[s'] interview[s] occurred at the police station [is] not, by [itself], dispositive" (citation omitted), Commonwealth v. Libby, 472 Mass. 37, 46 (2015), "there is a particular coercive element inherent in an interview at a police station" (citation omitted), Commonwealth v. Lopez, 485 Mass. 471, 480 (2020). At the police station, they were sequestered from each other on separate benches at opposite ends of the hallway. They were escorted to a men's restroom, which was then guarded by an officer. Cf. Libby, supra at 46-47 (defendant not in custody where he "went to police station voluntarily," his "freedom to leave the interview was [not] restricted at any time, and he took two unaccompanied bathroom breaks," and "the flow of the exchange was predominantly influenced by the defendant's own remarks"); Groome, 435 Mass. at 212-213 (defendant not in custody where "no questioning [occurred] beyond the request to see a license and identification," "contours of the discussion . . . were left entirely up to the defendant," "defendant was free to end the discussion and free to leave," and did in fact leave unaccompanied at one point).

 When the defendants were interviewed, Reigner asked them 

 Page 180 

inculpatory questions -- such as whether Adorno had a gun, whether a gun was in their SUV, and whether and where the SUV had stopped. The questions, which may have been asked in a friendly manner, as the judge found, were serious enough such that Perez asked, as she left the interview room, whether the interview would appear on her CORI and, thus, affect her employment. See Lopez, 485 Mass. at 480 (interrogation custodial where "officers asked [defendant] pointed questions" that focused on his "own actions, rather than his observations of what other people were doing"); Commonwealth v. Magee, 423 Mass. 381, 385 (1996) (interrogation custodial where questioning centered on defendant's potential criminal involvement). And, importantly, in the course of his questioning, Reigner informed Perez, "we're going to get you out of here as soon as we're done," a statement a reasonable person could easily conclude meant she could not leave before or until the questioning finished. 

 2. Attenuation. We turn now to whether, as the judge ruled, the attenuation doctrine applies. "The Commonwealth bears the burden of establishing that the evidence it has obtained and intends to use is sufficiently attenuated from the underlying illegality so as to be purged from its taint" (quotation and citation omitted). Tavares, 482 Mass. at 707. That said, the judge, guided by Pinney, considered the following factors: "(1) the temporal proximity of the statement to the arrest; (2) the presence of intervening circumstances between the arrest and the statement; (3) the observance of the Miranda rule subsequent to the illegal arrest; and (4) the purpose and flagrancy of the misconduct." Pinney, 97 Mass. App. Ct. at 401. The judge viewed the second and fourth factors as "favor[ing] the Commonwealth," the first factor as weighing against the Commonwealth as the statements were taken a mere two hours after the unlawful detention, and the third factor as weighing against the Commonwealth, but only "slightly," because although Miranda warnings were not read to the defendants, their "statements were not made during [their] unlawful detention, but only after [they were] released from the cruiser and traveled to the police station." Accordingly, we examine the second and fourth factors. [Note 11]

 Page 181 

 The judge considered the removal of the defendants' handcuffs and the transport to the police station in an unmarked cruiser as intervening circumstances. However, as we noted supra, the defendants remained in police custody continuously from their handcuffing through their transport to the police station. See Commonwealth v. Tuschall, 476 Mass. 581, 589-590 (2017) (no attenuation where defendant "made his statements roughly twenty-one hours after his arrest, during which time he was continuously in police custody" and "[n]o intervening circumstances further attenuated" his statements). Even if the record supported a conclusion that the defendants consented to Martin's transport to the station and the judge had so found, "consent 'does not automatically attenuate the taint of an illegality.'" Pinney, 97 Mass. App. Ct. at 401, quoting Commonwealth v. Fredericq, 482 Mass. 70, 80 (2019). Regardless, the removal of the handcuffs and the transport in an unmarked vehicle for interrogation at the police station were not "sufficiently distinguishable" from being handcuffed and held in a marked cruiser for nearly an hour "to [purge] the primary taint" of that initial unlawful arrest (quotations and citation omitted). Tavares, 482 Mass. at 706.

 Next, the judge expressly declined to "find that the purpose of the officer's conduct was to flout the requirements of the Fourth Amendment" and thus weighed the fourth factor in the Commonwealth's favor. This was error. The factor does not turn solely on whether the officer's subjective purpose was to flout constitutional requirements. It also involves the flagrancy of the disregard for those requirements and "how integral the unlawful [arrest] was to the acquisition of the evidence" (quotations and citation omitted). Tavares, 482 Mass. App. Ct. at 707. Here, the misconduct was committed expressly to acquire the statements, and the conduct, more importantly, constituted a "protocol" of the Springfield police department that promoted unconstitutional investigative detentions. On appeal, the Commonwealth argued -- and the evidence at the motion hearing indicated -- that the officers were implementing a formal protocol. As Kelly testified, Springfield police department protocol authorized this unconstitutional practice even where an individual is merely a witness. A formal policy such as this clearly constitutes flagrant police misconduct. See generally Commonwealth v. Rosario, 422 Mass. 48, 

 Page 182 

58 (1996) (determining whether police misconduct sufficiently flagrant to require suppression as deterrent against similar future conduct). Compare Commonwealth v. Butler, 423 Mass. 517, 525 (1996) (delay in presentment or other police misconduct may justify suppression as deterrent); Commonwealth v. Lewin, 405 Mass. 566, 585 (1989), S.C., 407 Mass. 617, 407 Mass. 629, and 408 Mass. 147 (1990) (perjurious police conduct constituting egregious police misconduct warranting suppression). Suppression is required here in order to avoid undermining the constitutional protections at issue. See Pinney, 97 Mass. App. Ct. at 400 (where evidence results from "exploitation of th[e] illegality" it is not "sufficiently distinguishable to be purged of the primary taint" [quotations and citations omitted]).

 Conclusion. In sum, we conclude that the statements were obtained as a result of an unlawful seizure and ensuing, closely connected custodial interrogation and that the statements should have been suppressed as fruits of the poisonous tree. The orders denying the motions to suppress are reversed.

 So ordered.

FOOTNOTES
[Note 1] Commonwealth vs. Jesmillie Perez. 

[Note 2] Kelly explained that he decided to keep the defendants separated from the injured officer's family because "[i]t wouldn't be pretty" if the injured officer's family were to interact with Adorno's family. Nonetheless, members of Adorno's family arrived at the hospital and were not taken into custody. Kelly further explained, "There were -- there was an officer that had been shot. There was an individual that had been shot and there were family members of both parties that had been showing up. I don't think it could get more tense than that." 

[Note 3] Regarding the removal of the defendants' handcuffs and their release from the cruiser, Martin testified, "I did not know the fashion in which they were moved from wherever they were." 

[Note 4] Martin testified to the following: 

Q.: "And when they were directed to come to you who did that?"

A.: "I don't remember."

Q.: "Was there an officer involved?"

A.: "Yeah. There were multiple uniformed officers. . . . [M]y vehicle was right next to the cruiser at the time. I don't know exactly if they needed to be escorted. I believe it was just pointed out."

[Note 5] The judge noted that suspects in custody were typically escorted inside the station through the garage. 

[Note 6] Both interviews were recorded. The interview with Lugo, who went first, lasted approximately twelve minutes. The interview with Perez lasted approximately thirteen minutes. 

[Note 7] The Commonwealth did not argue this theory; consequently, the defense had no opportunity to address it at the motion hearing. 

[Note 8] We need not address the defendants' alternative argument that their statements should be suppressed because of the failure to administer Miranda warnings. 

[Note 9] To the extent that the Commonwealth argues that "the police officers repeatedly telling [each] defendant 'you're not under arrest' and she was 'a witness to an incident,' erased any prior illegality that transpired," we see little support for such a conclusion in the record. Firstly, only one officer, Kelly, testified that he told the defendants that they were not under arrest, and secondly, even if such an assurance had been "repeatedly" given, this would not be dispositive. See Baye, 462 Mass. at 253. Here, in fact, Martin did not testify that he told the defendants that they were not under arrest; he informed them that he was taking them to the police station to provide statements as witnesses but "did not recall" whether he told them that they did not have to provide such statements. Likewise, Reigner affirmatively testified that he did not tell the defendants that they were or were not under arrest because "[i]t never came up whether they were or were not." Where Kelly was the sole officer who told the defendants that they were not under arrest, but who the judge expressly found had unlawfully arrested them, his statements to that effect -- occurring during the unlawful arrest -- did not mitigate the later events in which he took no part, namely the transport and interrogation. See Commonwealth v. Magee, 423 Mass. 381, 386 (1996) (defendant in custody where police did not inform her that she could leave); Pinney, 97 Mass. App. Ct. at 396 ("merely stating that someone is not in custody does not make it so"). Contrast Commonwealth v. Groome, 435 Mass. 201, 215 (2001) (officer's statement that defendant was "free to leave" dispelled any "mistaken impression" that defendant was in custody). 

[Note 10] We have previously commented that the fourth Groome factor "was revised by the Supreme Judicial Court" in its decision in Matta, 483 Mass. at 363. Commonwealth v. Vellucci, 98 Mass. App. Ct. 274, 278 (2020). See Commonwealth v. Spring, 96 Mass. App. Ct. 648, 650 (2019) (same). More recently, however, the Supreme Judicial Court has said that the custody inquiry under Groome and the seizure inquiry under Matta, although "much the same," "are not identical." Commonwealth v. Evelyn, 485 Mass. 691, 698 (2020). The court has also discussed the custody analysis, including the Groome framework, without citing Matta. See Commonwealth v. Medina, 485 Mass. 296, 301-302 (2020). 

[Note 11] We agree that, as to the first factor, two hours was in reasonably close temporal proximity, given that the defendants were continuously in the presence of police. As to the third factor, we do not agree that this factor should have been given any reduced weight on the ground stated by the judge, which embodied the assumption that once the defendants' detention while handcuffed in the back of the locked cruiser had ended, they were no longer in custody. As we have concluded above and repeat here, the defendants were still in custody. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.