COMMONWEALTH *vs.* CHARLES E. SMITH, FOURTH.

No. 92-P-1805.

Suffolk. September 17, 1993. - December 23, 1993.

Present: PERRETTA. KASS. & PORADA. JJ.

*Motor Vehicle*, Investigation of accident. *Constitutional Law*, Admissions
and confessions. *Evidence*, Admissions and confessions, Breathalyzer
test, Expert opinion, Blood alcohol test, Intoxication. *Practice, Crimi-
nal*, Admissions and confessions, Opening statement, Argument by
prosecutor. *Intoxication.*

A criminal defendant's constitutional privilege against self-incrimination
did not entitle him to suppression of his unsolicited inculpatory state-
ment to police officers or his inculpatory statement in response to the
officers' preliminary question about the obvious damage to the defend-
ant's automobile or his voluntary statements after he was informed of
his Miranda rights. [656-659]
At the trial of indictments in two counts for operating a motor vehicle
negligently, causing death to another, and leaving the scene of an acci-
dent, evidence of the results of the defendant's breathalyzer tests was
properly admitted. [659-661]
At a criminal trial, the prosecutor's reference to evidence that he reasona-
bly and in good faith could expect to introduce was not error requiring
a mistrial when the evidence was excluded by the judge. [662-664]
Discussion of the admissibility of evidence of retrograde extrapolation to
determine blood alcohol level, as reflected in G. L. c. 90, § 24 (1) (*e*),
Massachusetts cases, and cases in other States. [662-663]
At a criminal trial no error appeared in the receipt in evidence of expert
testimony, in the playing of a properly authenticated tape recording to
the jury, in the prosecutor's closing remarks, in the admission of evi-
dence of the victim's injuries, or in the phrasing of certain questions by
the prosecutor. [664-665]

INDICTMENTS found and returned in the Superior Court
Department on May 2, 1991.

A motion to suppress evidence was heard by *Sandra L.
Hamlin*, J., and the cases were tried before *Robert W.
Banks*, J.

*Dennis J. Kelly* for the defendant.

*Susan Underwood,* Assistant District Attorney, for the Commonwealth.

KASS, J. At about 1:30 A.M. on March 22, 1991, a light blue-silver Dodge minivan (the "van"), with the defendant Charles E. Smith, IV, at the wheel, struck and killed two Boston University undergraduates as they crossed Commonwealth Avenue in Boston. The van braked, but did not stop, and sped off. Police stopped the van shortly past 1:40 A.M., as it turned onto Boylston Street after travelling in a southerly direction on Massachusetts Avenue (i.e., away from the Charles River). They arrested Smith.

A jury returned verdicts finding Smith guilty of two counts (one count for each victim) of operating a motor vehicle negligently, causing death to another (G. L. c. 90, § 24G), and two counts of leaving the scene of an accident without making himself known (G. L. c. 90, § 24[2][a], as in effect prior to St. 1991, c. 460, § 2).[1] All told, the defense argues eight categories of error on appeal, some of which we can consider under a common topic heading. We affirm the convictions.

1. *Admissibility of the defendant's prearrest and postarrest statements.* When the police brought the van to a stop, one officer approached the driver's side and opened the door and the other officer went to the passenger side. Before either officer spoke, the driver, the defendant Smith, said, "Why did you stop us? We didn't hit anything."[2] Both officers had noticed that the van had considerable front end damage. Officer D'Entremont, the officer who had come to the driver's side, asked Smith what had happened to his car. Smith's

---

[1]The jury returned verdicts of not guilty on indictments for manslaughter.

[2]We take the facts concerning the stop and arrest from the findings of the Superior Court judge (she was not the trial judge) who conducted the hearings on the defendant's motion to suppress inculpatory statements which he made at and immediately after his arrest. The motion judge's findings are supported by the evidence. See *Commonwealth v. Doucette,* 391 Mass. 443, 447 (1984). The evidence given by the arresting officers at the jury trial, while not precisely the same, was not materially different. The motion to suppress was renewed at trial.

response was, "I don't know." During that exchange, D'Entremont smelled alcohol on Smith's breath. D'Entremont asked Smith for his license and registration and to step out of the van and over to the sidewalk. At that point, D'Entremont's partner, Officer MacDonald, read Smith his Miranda rights.

After MacDonald advised Smith of his Miranda rights, D'Entremont asked Smith if he had been drinking. Smith acknowledged a couple of beers at Zanzibar, a Boston night club. D'Entremont requested Smith to perform some field sobriety tests, a heel-to-toe walking test and a recitation of the alphabet test. In the officer's judgment, although Smith recited the alphabet satisfactorily, he failed the walking test, and D'Entremont thereupon placed Smith under arrest.

In his appeal, Smith urges that he was in custody from the instant the van was stopped and that the inculpatory statements he made before he received the Miranda warnings should have been suppressed. The Miranda warnings[3] are required when police officers have begun a custodial interrogation, i.e., when the person questioned has been taken into custody or, as a practical matter, is not free to move away. *Commonwealth* v. *Merritt*, 14 Mass. App. Ct. 601, 604 (1982). To be sure, when a police officer makes a motor vehicle pull over, the driver is not free to move away, but it would surely be untoward to require that a police officer approach a stopped vehicle declaiming the Miranda warnings.

As to the first inculpatory statement by Smith,[4] the claim of unconstitutional custodial inquisition requires no discussion because Smith spoke before he was spoken to. See *Commonwealth* v. *Trigones*, 397 Mass. 633, 643 (1986); *Commonwealth* v. *Delrio*, 22 Mass. App. Ct. 712, 717 (1986). The second inculpatory statement[5] was made in response to a question by D'Entremont but, in the case of motor vehicle accidents, some preliminary questions are permissible to en-

---

[3]*Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966).

[4]"Why did you stop us? We didn't hit anything."

[5]"I don't know," in response to D'Entremont's inquiry about what had happened to his (Smith's) car.

able the police to orient themselves, and we have not considered that sort of field investigation to establish a custodial environment which triggers the need for Miranda warnings. *Commonwealth* v. *Merritt*, 14 Mass. App. Ct. at 604-605. See also *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966); *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977); *Commonwealth* v. *Doyle*, 12 Mass. App. Ct. 786, 792-794 (1981); *Commonwealth* v. *McNelly*, 28 Mass. App. Ct. 985, 986 (1991); *Commonwealth* v. *Ayre*, 31 Mass. App. Ct. 17, 20-21 (1991). In this case the stop of the van was in response to relatively fast breaking developments. Radio broadcasts made by Boston police headquarters about the accident on Commonwealth Avenue had described a blue or silver van as involved. An alert taxicab driver had noted the license plate number of the van and had communicated that to the police, but the correct license number was in the process of confirmation as D'Entremont and MacDonald chased the van around the corner of Massachusetts Avenue and Boylston Street onto Boylston Street. Asking Smith what had happened to his obviously damaged car, especially when he had volunteered that he had not hit anything, was consistent with the duty of the officers to take some prefatory steps before focussing on Smith as a suspect and detaining him. The street-side question put to Smith was not an "incommunicado interrogation . . . in a police-dominated atmosphere" of the sort with which the *Miranda* case was concerned. See *Miranda* v. *Arizona*, 384 U.S. at 445; *Commonwealth* v. *Bryant*, 390 Mass. 729, 736-738 (1984).

Smith's admitting to the "couple of beers at Zanzibar's" occurred after MacDonald had delivered the Miranda warnings to Smith for the first time. The sobriety tests and arrest followed, and at that point MacDonald restated the Miranda warnings. On the way to the police station in a police cruiser, Smith volunteered three times that he had not run any red lights. At the police station Smith was informed of his Miranda rights for a third time. Smith's ground for suppression of the statements is that after the half-pass and half-fail results of the sobriety tests, the police no longer had probable

cause to arrest him and he should not have been in custody. That argument lacks even the plausibility of sophistry. There were abundant reasons for the police to have taken Smith into custody: the vehicle he was driving matched the description of a van involved in a hit and run accident; the license plate number matched the number of the van which fled from the scene of the accident; the damage to the front of the van was consistent with its having struck something — like bodies; and Smith, in addition to conceding some drinking, had failed the walking sobriety test.

The inculpatory statements made after Smith had received the Miranda warnings — the statement (in response to a question) that he had been drinking and the statements (without the stimulus of a question) that he had not run red lights — were determined by the motion judge to have been the product of a knowing and voluntary waiver of the right to remain silent. For that conclusion there was sufficient basis in the record. There is no testimony suggesting that the police had cajoled Smith into conversation. Smith stoutly claims not to have been seriously under the influence of alcohol at any time during the night and, therefore, cannot claim that intoxication deprived him of the ability to have waived his right to remain silent knowingly and voluntarily. It was not necessary to repeat the Miranda warnings, so recently given, as Smith stepped into the police cruiser. See generally *Commonwealth* v. *Silva*, 388 Mass. 495, 500-501 (1983).

2. *Admission of breathalyzer test results.* The motor vehicle homicide indictments charged Smith with having been under the influence of intoxicating liquor. G. L. c. 90, § 24G(*a*). A lesser offense included in that indictment was operating a motor vehicle in a reckless or negligent manner so that the lives or safety of the public might be endangered and causing death thereby, i.e., without the factor of intoxication. G. L. c. 90, § 24G(*b*). Implicit in the jury's verdict that the defendant was guilty, not as charged but of the lesser offense, is a finding that the defendant was not under the influence of intoxicating liquor. One may fairly ask, therefore, whether the issues Smith raises on appeal about

breathalyzer test evidence or retroactive extrapolation (see part 3 of this opinion) are moot in light of the verdict. Consumption of alcohol without intoxication, however, may be evidence of negligence, *Commonwealth* v. *Woods*, 414 Mass. 343, 350 (1993), and the blood alcohol content (BAC) test material could have had a bearing on the jury's findings of negligence. The better course is to consider the defendant's arguments relating to alcohol.

As to the breathalyzer or BAC test, the defense argument is that the government failed to establish that the breathalyzer machine had been tested conformably with a "periodic testing program." See 501 Code Mass. Regs. §§ 2.00-2.57 (1987). Before breathalyzer test results may be admitted in evidence, the Commonwealth must "establish (1) the existence of, and (2) compliance with, the requirements of the 'periodic testing program.' " *Commonwealth* v. *Barbeau*, 411 Mass. 782, 786 (1992). Such a program is distinct from the parallel program of semi-annual recertification of breath testing devices by the office of alcohol testing (OAT)[6] required under G. L. c. 90, § 24K, and 501 Code Mass. Regs. §§ 2.40 and 2.41 (1992). In *Morris* v. *Commonwealth*, 412 Mass. 861, 863 (1992), the court observed that the Secretary of Public Safety, in reaction to the *Barbeau* case, had established guidelines for a periodic testing program. Those guidelines imposed upon the police responsibility for testing breath analysis machines and provided that "every calibration standard analysis of a breath testing device, as conducted pursuant to [501 Code Mass. Regs. § 2.56] shall be deemed to be a test of such device." 501 Code Mass. Regs. § 2.41(1) (1992). *Morris* v. *Commonwealth, supra* at 863. Amendments to § 2.41 were effective February 13, 1992. Under the regulation, as amended, the police officer in charge of administering a breathalyzer test not only must test and prove the device every time it is used, *Morris* v. *Commonwealth*, 412 Mass. at 865 n. 7, but such an officer must change the simulator solution in the device, run calibration analyses, and

---

[6]OAT is a division within the Department of Public Safety. See *Morris* v. *Commonwealth*, 412 Mass. 861, 865-866 (1992).

record test results in a prescribed manner. 501 Code Mass. Regs. § 2.41 (2), (3), and (4).

The breathalyzer test applied to Smith was administered almost a year before the 1992 amendment to the breath testing device regulations.[7] There existed at the time, however, an "Infrared Breath Test Operator's Manual," prepared by OAT, which prescribed guidelines for the use, maintenance, and testing of breath testing devices. At Smith's trial, the director of OAT, Nancy Burns, testified that the operator's manual had been in circulation since 1987, and that the 1992 amendments to § 2.41 had enshrined in regulations what the manual had already required. Burns explained that after the *Barbeau* decision OAT had codified the procedures in regulatory form to make it clearer to anyone concerned what the responsibility of OAT was, but that the technical steps to be taken in testing and recording were not different. An officer of the Boston police department charged with maintaining and testing breath analysis machines gave testimony from which a trier of fact might find that the device with which Smith's breath was analyzed had been maintained and tested, and records kept, conformably with the criteria later incorporated in § 2.41. That periodic testing program, the court decided in *Morris* v. *Commonwealth*, 412 Mass. at 867, met the legislative objective of assuring accurate breathalyzer readings. See also 501 Code Mass. Regs. § 2.41(7), which provides that as to testing done prior to January 1, 1993, "compliance with the requirements of 501 Code Mass. Regs. § 2.41 [the periodic testing requirement] may alternatively be documented by records of calibration standard analyses appearing in the Calibration Section of the Maintenance and Use Log."

Based on the evidence we have described, the judge acted correctly in declining to suppress the results of Smith's breathalyzer tests and allowing the receipt of those results in evidence.

---

[7]Before the amendment, 501 Code Mass. Regs. § 2.41 (1987) provided, in its entirety: "The Office of Alcohol Testing shall devise a program for the periodic testing of certified breath testing devices and simulators."

3. *The prosecutor's reference to retrograde extrapolation.*
In his opening statement the prosecutor told the jury that the
government would present evidence through an expert wit-
ness that, taking into account the rate at which alcohol is
metabolized, the percentage by weight of alcohol in Smith's
blood level at the time of the accident must have been in the
range of .09 or .10 (the latter reading would have warranted
a presumption that Smith was under the influence of intoxi-
cating liquor)[8] if his blood alcohol level reading about two
hours after the accident was .06. This technique of working
backwards from the time of the test is called retrograde ex-
trapolation. At the close of the prosecutor's opening state-
ment, the defense moved for a mistrial on the ground that
the government could have had no reasonable expectation
that retrograde extrapolation evidence would be admitted.
That motion was denied and the defendant appeals from the
denial. When later in the trial retrograde extrapolation evi-
dence was offered, the judge ruled that it was not admissible,
but the defense takes the position that the jury had a whiff of
it through the opening statement.

Contrary to the suggestion of the defense, there is no ex-
press prohibition either in G. L. c. 90, § 24(1)(e), or in de-
cided cases, against receipt of retrograde extrapolation evi-
dence. The statute, i.e., § 24(1)(e), as amended through
St. 1986, c. 620, § 11, speaks of evidence of the percentage
of weight of alcohol in a defendant's blood "at the time of
the alleged offense." Often, as in the case at bar, the admin-
istration of a breathalyzer test or other blood test would fol-
low by some considerable period the "time of the alleged of-
fense." Extrapolation to that earlier time by a scientifically
acceptable or reliable method, see *Daubert* v. *Merrell Dow
Pharmaceuticals, Inc.*, 113 S.Ct. 2786, 2796 (1993),[9] might

---

[8]See G. L. c. 90, § 24(1)(e).

[9]In *Daubert*, the Court enlarged on the "generally accepted in the scien-
tific community" standard for admissibility of scientific evidence which
had initially been articulated in *Frye* v. *United States*, 293 F. 1013, 1014
(D.C. Cir. 1923). Trial judges, under *Daubert*, may assess whether the
reasoning or methodology underlying proffered testimony is scientifically
valid and whether that reasoning and methodology may be applied to the

logically be thought to be of assistance to a jury. *Common-wealth* v. *Connolly*, 394 Mass. 169, 175 (1985), upon which the defense relies, does not rule out retrograde extrapolation evidence; rather, it looked askance at attempts to impute blood alcohol levels on the basis of beer consumption and the defendant's body weight because the defendant in that case had withheld consent to a breathalyzer or blood test. In *Commonwealth* v. *Cruz*, 413 Mass. 686, 689 (1992), the court described, without adverse comment, testimony by a forensic chemist which imputed to the defendant a blood alcohol level of .19 on the basis of a breathalyzer reading of .07 made five hours after the defendant's arrest. See also the discussion in *Commonwealth* v. *Sargent*, 24 Mass. App. Ct. 657, 658-659 (1987).

In a number of jurisdictions retrograde extrapolation evidence has been admitted. *Ullman* v. *Overnight Transp. Co.*, 563 F.2d 152 (5th Cir. 1977). *People* v. *Emery*, 812 P.2d 665, 667 (Colo. App. 1990). *State* v. *Armstrong*, 689 P.2d 897, 899-900 (Kan. 1984). *State* v. *Bradley*, 578 P.2d 1267 (Utah 1978). *State* v. *Carter*, 142 Vt. 588, 590 (1983). Indeed, in three instances, courts have thought retrograde extrapolation evidence required to protect the rights of the defendant. See *State* v. *Geisler*, 22 Conn. App. 142, 159-165 (1990); *State* v. *McDonald*, 421 N.W.2d 492, 493-494 (S.D. 1988); *State* v. *Dumont*, 146 Vt. 252, 255 (1985). See also *Commonwealth* v. *Allen*, 394 Pa. Super. 127, 142-143 (1990) (Cirillo, P.J., dissenting).

What consideration of the statute and decisional law here and elsewhere establishes in an unusually convincing fashion is that the prosecutor was entitled to think, when making his

---

facts in issue. *Daubert*, 113 S.Ct. at 2796. In formulating the new standard, the Court took as a starting point Rule 702 of the Federal Rules of Evidence, which provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702 of the Proposed Massachusetts Rules of Evidence is identical, but neither in this case nor any that has come to our attention has the issue been argued whether the *Daubert* approach should be grafted onto Massachusetts practice.

opening statement, that retrograde extrapolation evidence would be admitted. Such evidence fell comfortably within the range of what the prosecutor could reasonably and in good faith expect to produce and have admitted. *Commonwealth* v. *Errington*, 390 Mass. 875, 883 (1984). The prosecutor's opening was not improper and did not require declaration of a mistrial.

4. *Other issues.* As to the testimony about the effects of ingesting alcohol given by Dr. George Katsas, a pathologist, the evidence received could fairly be characterized as common knowledge. The judge forcefully cut off questioning which was likely to induce responses that employed retrograde extrapolation methodology. As we have indicated, it is far from clear that he was obliged so to do, but he was certainly well within his discretion in declining to grant a motion for a mistrial because the prosecutor came close to the forbidden area.

It was not error to play, as an excited utterance, the tape which recorded a report of the accident by a percipient cab driver to his dispatcher and the police. The cab driver, who testified at trial, was allowed to testify that the tape recording was of his voice.

The defense cites six instances of what it describes as prejudicial closing argument. It would unnecessarily extend this opinion to discuss them all. We have read the closing argument and we do not think any of the claims of impropriety is well founded. All in all, the prosecutor's closing argument was fair comment about the evidence.

Some of the evidence was gruesome. The defendant protests that the evidence of the victims' injuries had no purpose other than to prejudice unfairly the jury against him. Details of the injuries suffered by the two young women were probative of the speed of the vehicle when it hit them. That speed, in turn, bore on the issues of negligence and recklessness which were being tried before the jury. The defendant's point is not well taken.

On several occasions, the prosecutor preceded a question with the phrase "I can't get into what you may have said" or

"I can't ask you." The prosecutor was warning witnesses not to blurt out hearsay. It may have been more elegant to say, "Without telling us what you said . . .," but the questions as put were not so badly formed as to require correction by the trial judge.

*Judgments affirmed.*