NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

21-P-916                                              Appeals Court

COMMONWEALTH  vs.  WILLIAM EARL.

No. 21-P-916.

Suffolk.     December 9, 2022. – June 7, 2023.

Present:  Rubin, Massing, & D'Angelo, JJ.


Homicide.  Assault and Battery by Means of a Dangerous Weapon. Practice, Criminal, Motion to suppress, Admissions and confessions, Voluntariness of confession, Harmless error. Constitutional Law, Admissions and confessions, Harmless error, Identification.  Evidence, Admissions and confessions, Identification, Authentication, Medical record.  Error, Harmless.  Identification.


Indictments found and returned in the Superior Court Department on February 12, 2014.

Pretrial motions to suppress evidence were heard by Robert N. Tochka, J., and the cases were tried before Linda E. Giles, J.


Joanne T. Petito for the defendant.
Paul B. Linn, Assistant District Attorney, for the Commonwealth.


MASSING, J.  A Superior Court jury convicted the defendant,

William Earl, of murder in the second degree of Samuel Constant

and of assault by means of a dangerous weapon, a knife, upon Faniesha Hunter. The jury heard evidence that minutes after the murder, the defendant confessed that he had just killed someone for "running his mouth." The defendant argues that his confession was the product of custodial interrogation because a special police officer chased, tackled, handcuffed, and pat frisked the defendant before questioning him, and that the confession should have been suppressed because he was not given Miranda warnings. We agree. Because evidence of the defendant's confession was not harmless beyond a reasonable doubt, we reverse the judgments. We also address the defendant's claims with respect to issues that are likely to recur in any new trial.

Background. The evidence at trial showed that one evening in January 2014, Hunter returned from work to her apartment in the Georgetowne Homes complex, located in the Hyde Park section of Boston. She found Constant, whom she was dating at the time, in her apartment with the defendant. Hunter did not know the defendant, and his behavior made her uneasy, so she gestured to Constant to follow her into one of the bedrooms. The defendant followed them into the room, where he pulled a knife from the waistband of his boxer shorts and lunged at Hunter. Constant intervened and began to struggle with the defendant, wrestling him back into the living room. While the defendant and Constant

fought, Hunter went to the kitchen to look for something to use as a weapon. She grabbed the first thing she could find, a kitchen utensil, and used it to hit the defendant. The defendant swung his knife at her but missed, then stumbled out the open front door of the apartment, still struggling with Constant. A Georgetowne Homes maintenance supervisor noticed two men running; one of them, Constant, fell to the pavement, face down, and the other ran off. Constant was breathing with difficulty and bleeding from his mouth and nose. The maintenance supervisor called 911 and attempted to perform cardiopulmonary resuscitation. Hunter went outside and found Constant lying in the parking lot.

Shortly thereafter, the defendant was apprehended nearby by Vincent Tranfaglia and Jean Thermitus, two uniformed security guards certified as special Boston police officers and employed by Longwood Public Safety, a private security company contracted to patrol Georgetowne Homes and the surrounding area. Thermitus saw the defendant running down the middle of Crown Point Drive in heavy traffic, knocking on the windshields of passing vehicles and attempting to stop them. As yet unaware of the stabbing, Thermitus activated the lights of his marked vehicle, parked in the middle of the street, and approached the defendant, who was bleeding heavily from his ear. Upon seeing Thermitus, the defendant fled. Thermitus ran after him, tackled

him from behind, placed him in handcuffs, and pat frisked him. Thermitus then asked the defendant, "[W]hat was going on, why he took off." The defendant responded, "I just killed somebody," and added, "If you walk straight ahead you will find something." When Thermitus asked him "why," the defendant answered, "[B]ecause he was running his mouth."

Tranfaglia, who had arrived on the scene and helped Thermitus secure the defendant, requested help from the Boston police and medical assistance for the defendant. About this time, the maintenance supervisor approached, yelling and gesturing for Tranfaglia's attention. Tranfaglia followed the maintenance supervisor to an area where Constant was lying on the ground, cradled in Hunter's arms. Constant had been stabbed in the face, head, shoulder, and chest, and had no pulse. By the time emergency medical personnel arrived, Constant was dead.

The defendant was transported to the emergency room at Brigham and Women's Hospital (hospital), where he was treated for lacerations to his head and neck. Members of the Boston police homicide unit, who had arrived at the crime scene, arranged for Hunter to be taken to the hospital for an identification procedure. As soon as Hunter entered the emergency unit, she identified the defendant from across the room. The defendant was arrested and taken from the hospital to the police station for questioning. In a videotaped (recorded)

interview, he claimed not to understand why he was under arrest and that he had been the victim of an attack.[1]

The day after the murder the police recovered a "KA-BAR" brand folding knife near the murder scene.  A metal fragment from the knife was found in one of Constant's fatal stab wounds, and deoxyribonucleic acid (DNA) analyses of blood found on the knife's blade and knife's handle were consistent with the DNA profiles of Constant and the defendant, respectively.  The statistical probability of random matches was infinitesimally small.

A letter the defendant wrote to Constant's mother from jail two years after the murder was admitted in evidence.  In the letter, the defendant "apologize[d] about what happened to your son," claimed that "it was not [his] intention to murder your son," but that he was being attacked and the only way he could escape the apartment was "by assaulting your son and stabbing him twice in his chest area."  He added that he used "a kabar pocket knife."

The defendant was indicted on charges of murder in the first degree and assault by means of a dangerous weapon.  The murder charge was submitted to the jury on theories of

---

[1] We set forth the circumstances of the defendant's roadside confession, the hospital identification, and the recorded interview in greater detail below in connection with the discussion of the defendant's motions to suppress.

deliberate premeditation and extreme atrocity and cruelty.  The defendant's primary defense was that he acted in self-defense.  The jury found the defendant guilty of murder in the second degree and assault by means of a dangerous weapon.

Discussion.  A.  Motions to suppress.  Prior to trial, the defendant filed a motion to suppress statements -- his initial roadside confession and his subsequent recorded interview at the police station -- and a motion to suppress Hunter's hospital identification.  After a two-day evidentiary hearing, the motion judge denied the motion to suppress the identification from the bench; he later issued written findings denying the motion to suppress statements.  On appeal, the defendant argues that both motions were wrongly decided.

When reviewing a ruling on a motion to suppress, we are bound by the judge's subsidiary findings of fact, unless they are clearly erroneous; "[h]owever, where the ultimate findings and rulings bear on issues of constitutional dimension, they are open for review.  Our appellate function requires that we make our own independent determination on the correctness of the judge's application of the constitutional principles to the facts as found" (quotations and citations omitted).  Commonwealth v. Groome, 435 Mass. 201, 211 (2001).  Accord Commonwealth v. Tremblay, 480 Mass. 645, 651-652 (2018) (voluntariness of defendant's Miranda waiver and statements

during custodial interrogation); Commonwealth v. Johnson, 473 Mass. 594, 602 (2016) (identifications arising from police procedures); Commonwealth v. Carnes, 457 Mass. 812, 818-819 (2010) (whether defendant was subject to custodial interrogation). But see Johnson, supra (motion judge's assessment of suggestiveness of identifications without police wrongdoing under common-law principles of fairness reviewed for abuse of discretion). We "review de novo any findings based entirely on a video recording." Commonwealth v. Yusuf, 488 Mass. 379, 385 (2021).

We address the suppression motions in chronological order by subject matter: the roadside confession, the hospital identification, and the recorded interview.

1. The roadside confession. a. Motion judge's findings. The defendant argues that his incriminating statements to special police Officer Thermitus should have been suppressed because Thermitus failed to give him Miranda warnings. We set forth the facts found by the motion judge, supplemented with uncontroverted testimony from the suppression hearing that does "not detract from the judge's ultimate findings." Commonwealth v. Garner, 490 Mass. 90, 93-96 (2022), quoting Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

As noted above, Thermitus and Tranfaglia were security guards employed by a private security company and certified as

special Boston police officers.  They are State actors for Miranda purposes.  See Commonwealth v. Leone, 386 Mass. 329, 334-335 (1982).  Thermitus was patrolling the Georgetowne Homes area in a marked "Longwood" cruiser around 5:45 P.M. on an "extremely cold" January night when he saw the defendant in the middle of Crown Point Drive, in heavy traffic, knocking on the windshields of passing vehicles.  Thermitus activated his cruiser's lights, radioed for assistance, stopped in the middle of the street, and then approached the defendant on foot.  The defendant was bleeding from his ear.  Seeing Thermitus, the defendant took off his sweatshirt and threw it to the ground, leaving himself shirtless, took two "aggressive" steps toward Thermitus, and then turned and ran into a wooded area. Thermitus ran after him.

Special police Sergeant Tranfaglia arrived at the scene in response to Thermitus's radio call.  Tranfaglia saw Thermitus yelling at the defendant to stop.[2]  Thermitus tackled the defendant to the ground and immediately placed him in handcuffs.

---

[2] Tranfaglia testified that to assist Thermitus, he took out his pepper spray and yelled multiple times to the defendant, "I'm going to spray."  The judge's findings do not mention this testimony, which suggested a more coercive atmosphere than the judge found.  Rather than address whether this factual omission, which detracts from the judge's ultimate finding, see Garner, 490 Mass. at 95-96, is clearly erroneous, we do not consider this aspect of Tranfaglia's testimony in our analysis.

Then, with Tranfaglia's help, Thermitus sat the defendant against a tree beside the road and pat frisked him; the defendant was unarmed.

According to Tranfaglia, "the defendant stated that he had been shot down the street," although neither officer saw any evidence of gunshot wounds. Tranfaglia stepped away to request assistance from the Boston police and emergency medical services. Thermitus remained with the defendant and asked him "why he ran," to which the defendant replied, "I just killed somebody, and if you walk straight ahead you will find something." Thermitus asked the defendant, "[W]hy?" The defendant responded that "this person was running his mouth, so I did what I had to do."[3] Thermitus remained with the defendant, who was still handcuffed, until an ambulance arrived and the Boston police took over.

---

[3] Thermitus testified that the defendant confessed to the killing before saying that he had been shot, although Thermitus wrote in his police report that the defendant said he had been shot first. Tranfaglia testified that after he helped Thermitus handcuff the defendant, the officers were trying to figure out "what was going on" when the defendant stated that he had been shot. At that point Tranfaglia went to call for Boston police backup and emergency medical assistance. The judge found that Tranfaglia left Thermitus with the defendant while he went to radio for help and returned about two minutes later. The judge's findings imply that the defendant confessed during the two-minute interval he was left alone with Thermitus.

The motion judge found that the defendant was not in custody when he made the incriminating statements and that Thermitus's questioning did not amount to interrogation.

b. Custody. "It is well settled that Miranda warnings are necessary only when a defendant is subject to custodial interrogation, Commonwealth v. Jung, 420 Mass. 675, 688 (1995), and that it is the defendant's burden to prove custody, Commonwealth v. Larkin, 429 Mass. 426, 432 (1999)." Commonwealth v. Vellucci, 98 Mass. App. Ct. 274, 277 (2020).

"An interview is custodial where 'a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive.'" Commonwealth v. Cawthron, 479 Mass. 612, 617 (2018), quoting Larkin, 429 Mass. at 432. "The crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody. Thus, if the defendant reasonably believed that he was not free to leave, the interrogation occurred while the defendant was in custody, and Miranda warnings were required" (citations omitted). Commonwealth v. Damiano, 422 Mass. 10, 13 (1996).[4]

---

[4] In the context of whether a police officer had "seized" the defendant, for which reasonable suspicion of criminal conduct is required, the Supreme Judicial Court observed that "because civilians rarely feel 'free to leave' a police encounter," Commonwealth v. Matta, 483 Mass. 357, 360 (2019), "the more pertinent question is whether an officer has, through

In a myriad of cases assessing custody, "the court considers several factors:  (1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." Groome, 435 Mass. at 211-212.  The so-called "Groome factors," see Carnes, 457 Mass. at 819, are not exclusive; the court must consider the totality of the circumstances.  See Commonwealth v. Medina, 485 Mass. 296, 301 (2020).  The Groome factors merely provide a framework for assessing the ultimate question: "whether the defendant was subjected to 'a formal arrest or

_____

words or conduct, objectively communicated that the officer would use his or her police power to coerce that person to stay," id. at 362.  "The custody and seizure inquiries, however, are not identical."  Commonwealth v. Evelyn, 485 Mass. 691, 698 (2020).  While the Matta decision did not alter the custody analysis, see Evelyn, supra at 698-699; Commonwealth v. Lugo, 102 Mass. App. Ct. 170, 179 n.10 (2023), both tests focus on "the objective circumstances of the encounter" and "attempt to ascertain whether, considering the totality of the circumstances, an individual has been compelled to interact with the police."  Evelyn, supra.  In this case, the defendant has never claimed that the initial seizure was unjustified.

restraint of freedom of movement of the degree associated with a formal arrest.'"  Medina, supra, quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995).

In concluding that the defendant was not in custody, the motion judge focused on the first three Groome factors.  The judge found, first, that "[t]he questioning took place on a neutral site near a public road" and not in a "police-dominated atmosphere."  Second, the special police officers did not convey to the defendant that he was suspected of Constant's murder; indeed, the officers had not yet learned of the stabbing.  Third, "the questioning was informal and investigatory, and not aggressive, accusatory, or coercive."  In light of these factors, the judge did not consider the fact that the defendant was handcuffed to be a sufficient restraint on his freedom to turn the encounter into the equivalent of a formal arrest.  Our independent review of the facts as found by the motion judge leads to the opposite conclusion.

We begin, rather than end, by recognizing that restraints on the defendant's freedom of movement defined his encounter with the special police officers:  in response to the defendant's erratic conduct in the middle of a busy street, the officers chased him down, tackled him, handcuffed him, and pat frisked him before seating him by the side of the road for questioning.  Such conduct would typically be perceived as

coercive.  Cf. Commonwealth v. Portee, 82 Mass. App. Ct. 829, 833 (2012) (after troopers "sought to subdue [defendant] and prevent him from fleeing, a reasonable person in the defendant's circumstances would have understood that the troopers were in the process of effecting an arrest" for purposes of proving crime of resisting arrest).

The Groome factors, which derived in part from Commonwealth v. Bryant, 390 Mass. 729 (1984), were developed because often "the problem whether interrogation has taken place in custodial circumstances is a vexing one, susceptible to resolution . . . only by close scrutiny of the particular questioning session." Bryant, supra at 736.  A nuanced analysis of the Groome factors is unnecessary, however, for "obvious cases in which a suspect has been formally arrested or otherwise deprived of his physical freedom by police agents."  Bryant, supra.  To illustrate the point, if a defendant is under arrest, the second and third Groome factors, which go to the nature of the communications between the officers and the defendant, are irrelevant:  even if the arresting officer's questions are conversational and not accusatory, the defendant is no less in custody.  Simply put, in this case it is obvious that a reasonable person in the defendant's position would not have believed that he was free to leave.

Notwithstanding the Groome factors' questionable utility here, we address them in the interest of completeness.

i. Place of the interrogation. The fact that questioning takes place on the street or in a public area often weighs against a finding of custody. See, e.g., Commonwealth v. Tejada, 484 Mass. 1, 9, cert. denied, 141 S. Ct. 441 (2020) (fact that "interrogation was in a public parking lot, not in a police station or other secluded area" weighed against determination that defendant was in custody); Vanhouton v. Commonwealth, 424 Mass. 327, 331 n.7, cert. denied, 522 U.S. 834 (1997), quoting Pennsylvania v. Bruder, 488 U.S. 9, 10 (1988) ("traffic stops commonly occur in the 'public view,' in an atmosphere far 'less "police dominated" than that surrounding the kinds of interrogation at issue in [Miranda v. Arizona, 384 U.S. 436 (1966)] itself'"); Commonwealth v. Smith, 35 Mass. App. Ct. 655, 657-658 (1993) (defendant not in custody where police stopped his car to investigate motor vehicle accident and asked preliminary "street-side" questions).

But the defendant was not questioned in connection with a traffic stop, which generally does not rise to the level of custodial interrogation. See Vellucci, 98 Mass. App. Ct. at 277 ("As a general rule, persons temporarily detained during an ordinary traffic stop are not in custody for purposes of Miranda, even though they may not feel free to leave"). Nor

could the questioning of the defendant be characterized as a routine "field investigation" as in Smith, 35 Mass. App. Ct. at 658, and the defendant did not initiate the encounter as in Tejada, 484 Mass. at 8. Here, prior to questioning, two uniformed officers positioned the defendant against a tree next to the side of the road on a cold winter night, after one of them had chased him, tackled him, placed him in handcuffs, and pat frisked him. "To determine if the location of an interrogation contributed to a coercive environment, we consider the circumstances 'from the point of view of the defendant.'" Cawthron, 479 Mass. at 618, quoting Commonwealth v. Conkey, 430 Mass. 139, 144 (1999), S.C., 443 Mass. 60 (2004). From the defendant's point of view, the officers' actions objectively created a coercive and police-dominated environment, even if it was not in a police station.

   ii. Conveying that defendant was a suspect. Questioning that conveys the message that the defendant is suspected of a crime lends to a coercive environment and typically supports the conclusion that the defendant is in custody. See Cawthron, 479 Mass. at 619; Commonwealth v. Jones, 42 Mass. App. Ct. 378, 382 (1997). Brief, preliminary questions asked in an effort to confirm or dispel suspicion of criminal activity typically do not. See Commonwealth v. Kirwan, 448 Mass. 304, 311 (2007). An open-ended preliminary question such as "What happened?" does

not convey suspicion of wrongdoing.  See Commonwealth v. Callahan, 401 Mass. 627, 630 (1988).

Here, the judge erroneously focused on the officers' subjective point of view, emphasizing that they did not yet know about the murder and that "Thermitus placed handcuffs on the defendant in order to find out what was going on.  The defendant was not under arrest."  "[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances, not on the subjective views harbored by either the interrogating officers or the person being questioned" (citations omitted).  Medina, 485 Mass. at 303.[5] After being forcefully detained, the first statement that the defendant made was that he had been shot.  The officers did not respond by asking neutral questions such as "what happened" or where he had been shot.  Instead, Thermitus asked "why he ran."[6] From Thermitus's perspective, the question may have been

_____

[5] The judge, who decided the motion to suppress in April 2016, did not have the benefit of the Medina decision.

[6] Tranfaglia in fact did testify that he asked the defendant neutral, preliminary questions before the tenor of the questioning became more pointed.  According to Tranfaglia, after the defendant said he had been shot, Tranfaglia asked, "[W]here?," and the defendant said, "[W]ay down the street." Tranfaglia responded, "You were shot down there?  What are you doing all the way up here?"  The defendant then said, "Fuck you, . . . fuck this, get me EMS," prompting Tranfaglia to go back to his cruiser and radio for help.  However, the motion judge omitted this part of Tranfaglia's testimony from his findings, and we do not consider it in our analysis.  See note 2, supra.

neutral, but from the defendant's perspective, it may have implied that if he had done nothing wrong, he would have had no reason to run. A reasonable person in the defendant's position, having been pursued and tackled by a police officer, then asked why he had attempted to flee, would likely perceive that the officer suspected him of criminal activity. That Thermitus did not believe the defendant to be under arrest, or that he detained the defendant just so he could "find out what was going on," is immaterial if his words and actions conveyed something else. See Groome, 435 Mass. at 212 n.13 ("an officer's subjective suspicions are relevant to the custody inquiry only if those suspicions have been communicated to the defendant"). Cf. Damiano, 422 Mass. at 13 ("The question whether the defendant was in protective custody is not controlling. The crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody").

iii. Nature of the interrogation. The nature of the questioning was also consistent with a custodial atmosphere. As we have already noted, even after the defendant said he had been shot, Thermitus questioned him about "why he ran." The follow-up question -- "why" the defendant had "just killed somebody" -- was even more clearly intended to gather inculpatory evidence. Even if Thermitus's questioning was "not aggressive, accusatory,

or coercive," as the motion judge found, it was hardly a "friendly chat" with the defendant's "voluntary acquiescence." Bryant, 390 Mass. at 737.

iv. Defendant's freedom to end the encounter. From beginning to end, the special police officers' interaction with the defendant communicated to a reasonable person in the defendant's position that he was not at liberty to end the interview and leave. After using force to prevent the defendant from running away, the special police officers did not leave his side, nor remove the handcuffs, until Boston police detectives took over and the defendant was transported by ambulance to a hospital. The defendant was later formally arrested. The fourth Groome factor, whether the defendant "was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest," Groome, 435 Mass. at 212, supports a finding of custody.

v. Totality of the circumstances. Viewed in their totality, the facts as found by the motion judge depicted a coercive environment. Moreover, the judge erroneously discounted the officers' use of handcuffs to restrain the defendant throughout the encounter. Placing a suspect in handcuffs is usually considered a physical restraint on freedom tantamount to arrest. See, e.g., Commonwealth v. Pinney, 97

Mass. App. Ct. 392, 396-397 (2020); Commonwealth v. Gordon, 47 Mass. App. Ct. 825, 827 (1999). Conversely, the absence of handcuffs is usually cited to negate a finding of custody. See, e.g., Cawthron, 479 Mass. at 618 (defendant not in custody where questioning occurred "in a public parking lot, during the daytime, and the defendants were neither handcuffed nor otherwise physically restrained"); Commonwealth v. Lopes, 455 Mass. 147, 163 (2009) ("defendant was not in custody after his handcuffs were removed and he was told he was not under arrest"); Commonwealth v. Burbine, 74 Mass. App. Ct. 148, 152 (2009) (interrogation of defendant not custodial where officers "did not place him under arrest, handcuff him, or physically restrain him by placing him in a cruiser or escorting him into the station").

Although "[i]t is not dispositive that the defendant was handcuffed," Commonwealth v. Williams, 422 Mass. 111, 118 (1996), cases holding that a handcuffed suspect was not in custody usually arise where the defendant had been detained to allow officers to complete a threshold inquiry justified by reasonable suspicion of criminal activity. Where handcuffing the suspect is considered a reasonable step to ensure officer safety or to prevent flight, it does not transform an investigative stop into an arrest. See, e.g., id. at 117-119; Vellucci, 98 Mass. App. Ct. at 277, 279; Commonwealth v. Dyette,

87 Mass. App. Ct. 548, 556-557 (2015); Commonwealth v. Andrews, 34 Mass. App. Ct. 324, 329-330 (1993).  The motion judge found that the officers were confronted with "a volatile situation that occurred quickly and unexpectedly"; however the evidence did not suggest,[7] nor did the judge find, that the officers were in any danger or that the defendant presented a threat to public safety that might excuse the failure to give Miranda warnings.  See Pinney, 97 Mass. App. Ct. at 397, quoting New York v. Quarles, 467 U.S. 649, 657 (1984) ("The United States Supreme Court has stated that, in some circumstances, 'the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination'").

While our independent analysis of the Groome factors supports our view that the defendant's detention by the special police officers was custodial, as discussed supra, it is largely beside the point:  it is obvious that a reasonable person in the defendant's position would have experienced the interaction as coercive, would not have believed that he was free to leave, and would have perceived the restraint on his freedom of movement as

---

[7] Thermitus testified, repeatedly, that he had no concern for his own safety, and any hint of danger was quickly dispelled when he pat frisked the defendant.

the equivalent of that associated with a formal arrest.  Because we conclude that the defendant was in custody, we turn to the question whether he was subjected to interrogation.

c.  Interrogation.  "Miranda warnings are required when a person is subjected to 'custodial interrogation,' i.e., 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Commonwealth v. Doyle, 12 Mass. App. Ct. 786, 792 (1981), quoting Miranda, 384 U.S. at 444.  The defendant was subject to "express questioning" beyond that "normally attendant to arrest and custody."  Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980).  See Commonwealth v. Kacavich, 28 Mass. App. Ct. 941, 941 (1990).  After taking the defendant into custody, Thermitus asked him "why he ran," and when the defendant responded that he had just killed somebody, Thermitus asked, "Why?"

The motion judge, however, did not consider Thermitus's questioning to amount to "interrogation" because the judge viewed the questions as "preliminary in nature and directed to discovering who the defendant was and what had happened to him." In so concluding, the judge erroneously relied on Commonwealth v. Gonsalves, 445 Mass. 1, 9 (2005), cert. denied, 548 U.S. 926 (2006) ("Questioning by law enforcement agents to secure a volatile scene or establish the need for or provide medical care

is not colloquially understood as interrogation . . . . Rather, such questioning is considered part of the government's peacekeeping or community caretaking function" [emphasis added]). This language was taken from the court's discussion of whether statements made to law enforcement agents are to be considered "testimonial" under Crawford v. Washington, 541 U.S. 36 (2004). The court made it clear that it was not relying on "definitions of interrogation found throughout the Miranda v. Arizona, 384 U.S. 44 (1966), case law, but rather on everyday, common understandings of the term." Gonsalves, supra at 7.[8]

The Commonwealth's reliance on Kirwan, 448 Mass. at 311 (officer's "questioning was generally of a fact-finding nature, intended to verify or dispel a reasonable suspicion of criminal activity, for which Miranda warnings are not required"), is also misplaced. This language was taken from the Kirwan court's analysis of the Groome factors and concerned whether the defendant was in custody, not whether he was subjected to interrogation. See Kirwan, 448 Mass. at 313.[9]

---

[8] Although at the hearing on the motion to suppress the Commonwealth relied on the quoted language from Gonsalves to argue that questions asked in the course of community caretaking are not interrogation, on appeal the Commonwealth makes no argument concerning community caretaking. Accordingly, we need not decide whether community caretaking was involved here or, if it was, whether that would be relevant to any issue before us.

[9] Similar language from Commonwealth v. Borodine, 371 Mass. 1, 4 (1976), cert. denied, 429 U.S. 1049 (1977) ("The questions

The questioning here was much like that found to be interrogation in Gordon, 47 Mass. App. Ct. at 826, where the arresting officer was "attempting, he testified, to calm [the defendant] down, and asked what she was doing in the area at that early hour (5:15 A.M.)."  "The fact that [Thermitus's] question was introductory does not automatically cause it to be classified as merely 'preliminary' and not interrogatory for Miranda purposes."  Id. at 828 (distinguishing cases in which preliminary questioning did not amount to custodial interrogation).  See Damiano, 422 Mass. at 13 ("The fact that the trooper's initial questioning was not hostile and was undertaken simply to find out what the defendant knew about what had happened does not excuse the failure to give Miranda warnings").

The defendant was subject to custodial interrogation. Because he was not given Miranda warnings, his motion to suppress his statements to Thermitus should have been allowed.[10]

d.  Harmless error analysis.  The question remains whether the improper admission of the defendant's statements was

_____

were preliminary, directed to discovering who the defendant was and what he knew about the circumstances"), likewise concerned the issue whether the questioning was custodial, see id. at 4-5.

[10] Because we conclude that the defendant's roadside confession should have been suppressed on this ground, we need not address the defendant's separate contention that it was not voluntary.

harmless beyond a reasonable doubt.  See Chapman v. California, 386 U.S. 18, 24 (1967); Commonwealth v. Santos, 463 Mass. 273, 287-289 (2012).  Other than the defendant's confession, the Commonwealth presented no evidence of motive, and the inferential evidence of the defendant's intent to kill Constant was not overwhelming.  Indeed, according to Hunter's version of the events, the defendant's actions, which began with an attempt to stab her, were inexplicable.  The defendant claimed that he acted in self-defense, as he maintained in his letter to Constant's mother, and the jurors were also instructed on voluntary and involuntary manslaughter.  The evidence that the defendant admitted, shortly after the crime, that he had "just killed somebody" because that person was "running his mouth" was the strongest evidence offered at trial to provide a motive for the defendant's actions, to disprove his self-defense claim, and to prove malice.  The prejudicial impact of this evidence was "too strong to be considered harmless."  Commonwealth v. Howard, 469 Mass. 721, 737 (2014), S.C., 479 Mass. 52 (2018).  See Commonwealth v. Harris, 371 Mass. 462, 473 (1976) (referring to "the almost conclusive effect of any defendant's confession on a jury").  Accordingly, the defendant's convictions must be reversed.[11]

---

[11] As the defendant was impliedly acquitted of murder in the first degree, any retrial of the murder indictment must be

2. <u>Hospital identification</u>. The defendant claims that Hunter's identification of him in the hospital should have been excluded because the procedure was unreliable and unnecessarily suggestive. At the suppression hearing, Boston police Detectives Francis McLaughlin and Robert Kenney, whose testimony the motion judge "found to be truthful in all respects," testified that the identification proceeded as follows.

McLaughlin accompanied Hunter, in the back seat of a police cruiser, as she was transported to the hospital. He explained that there was a person at the hospital who might or might not have been involved in the stabbing of Constant -- the police did not know -- and that it was important to determine if this person was or was not involved. Before bringing Hunter into the emergency room, McLaughlin asked the police officers standing near the defendant to move away; he intended to walk Hunter around the perimeter of the emergency room, past the partitioned areas where the patients were being treated, to see if she recognized anyone. However, as soon as McLaughlin and Hunter rounded the corner from the hallway to the treatment area, Hunter saw the defendant across the room and said, "That's him, that's him. He's the one." At the time, the defendant had just

treated as a trial for murder in the second degree. See <u>Commonwealth</u> v. <u>Figueroa</u>, 468 Mass. 204, 228 (2014); <u>Commonwealth</u> v. <u>Harrington</u>, 379 Mass. 446, 455 (1980).

received treatment for head wounds, and his face was illuminated by a surgical light.

The motion judge found that the police did "an exemplary job of trying to make sure the identification procedure was done fairly and orderly," that it was conducted promptly after the incident, and that the lighting did not make the procedure "unduly suggestive."  We agree.

"Although one-on-one showup identification procedures are generally disfavored as inherently suggestive, they only raise due process concerns if it is determined that the procedure was unnecessarily or impermissibly suggestive" (quotation and citation omitted).  Commonwealth v. Moore, 480 Mass. 799, 811-812 (2018).  Moreover, showup identifications are appropriate "if there is 'good reason' to secure prompt identification of a suspect."  Id. at 812, quoting Commonwealth v. Dew, 478 Mass. 304, 306 (2017).  See Commonwealth v. Austin, 421 Mass. 357, 361-362 (1995); Commonwealth v. Travis, 100 Mass. App. Ct. 607, 613 (2022).  The burden is on the defendant to prove not only that the identification procedure being challenged "was suggestive, but [also] that it was 'unnecessarily suggestive.'"  Johnson, 473 Mass. at 597, quoting Commonwealth v. Crayton, 470 Mass. 228, 235 (2014).

Here, the police had good reason to conduct the hospital identification promptly, during the investigation of a violent

crime, to determine whether to arrest or release the defendant. The defendant does not argue otherwise. Rather, he focuses on two factors that he characterizes as "especially suggestive circumstances": the fact that his head was illuminated by a surgical light, and "Hunter's knowledge that she hit the assailant in the head with a metal object."

As to the lighting, which was the result of medical rather than a police procedure, we discern no abuse of discretion in the judge's determination that it did not create "highly or especially suggestive circumstances" that would render the identification unreliable. Johnson, 473 Mass. at 598, 602. Even when suspects are illuminated as the result of police procedure during a showup, this circumstance does not make an identification impermissibly suggestive. See, e.g., Commonwealth v. Meas, 467 Mass. 434, 442, cert. denied, 574 U.S. 858 (2014); Commonwealth v. Phillips, 452 Mass. 617, 628-629 (2008). The defendant's suggestion that Hunter positively identified the defendant based on the wound to his head is mere speculation. Moreover, the appearance of a suspect based on his recent involvement in the crime under investigation is part of the inherent suggestiveness of a showup procedure, not a special element of unfairness. See Commonwealth v. Chotain, 31 Mass. App. Ct. 336, 341-342 (1991) (hospital identification reliable notwithstanding officers' statement to witness "that the man he

would see had a gash on his head in the same place that [the witness] had struck the intruder").[12]

3. _Recorded interview_. The defendant argues that his recorded interview at the police station following his arrest should have been suppressed because the Commonwealth failed to show, beyond a reasonable doubt, that his waiver of his Miranda rights, and the statements themselves, were voluntary. See Tremblay, 480 Mass. at 655-656, 661-662 ("Due process requires a separate inquiry into the voluntariness of [a defendant's statement] apart from the validity of the Miranda waiver" [citation omitted]). Because the motion judge's ruling on the defendant's motion to suppress the recorded interview was based entirely on his review of the recording and not drawn from any live testimony, our review is de novo, without deference to the motion judge's findings of fact. See Yusuf, 488 Mass. at 385; Tremblay, supra at 646-647, 656-657.

The recorded interview begins with the defendant walking into the interview room, taking a seat, standing up when directed to a different chair, remaining standing as an officer removes his handcuffs, and then sitting again, all without assistance. The defendant listened and responded appropriately

_____

[12] Because Hunter's unequivocal out-of-court identification of the defendant was admissible, she was properly permitted to identify him in court. See Dew, 478 Mass. at 315.

as McLaughlin asked for identifying information and then went through the defendant's Miranda rights one by one; the defendant followed along on a written Miranda waiver form, initialed each as it was read to him, and then signed the form.  The tone of the interview was cordial and conversational throughout.  After waiving his Miranda rights, the defendant said, "I won't answer any questions until I gain a full understanding of what's going on."  McLaughlin explained that a man had been stabbed in Hyde Park and that the defendant was under arrest as a result of the police investigation.  The defendant responded, "I still have no idea why I'm here," and during the interview he maintained not only that he did not understand what was going on, but also that he had been the victim of an attack.  At one point, he asserted, "You guys don't have the crucial evidence to put me away."  Toward the end of the interview, the defendant said, "I had nothing to do with anything, I don't understand why I'm in the police station, where's the guy who could have attacked me?"  Kenney answered, "It could be the guy that's dead," to which the defendant responded, "Somebody did a good job then."  Soon thereafter the defendant said he was done answering questions, and the detectives promptly ended the interview.

Although "[t]he voluntariness of the waiver on the basis of Miranda and the voluntariness of the statements on due process grounds are separate and distinct issues," Commonwealth v.

Edwards, 420 Mass. 666, 673 (1995), the defendant's argument does not distinguish between the two. He argues that his "incoherent" responses to questions, his statements that he did not know what was going on, and his voluntary consumption of substances[13] rendered his waiver and statements involuntary. In any event, both issues are "determined in light of the totality of the circumstances and they share many of the same relevant factors." Id. These include the defendant's conduct, his "age, education, intelligence and emotional stability, . . . his physical and mental condition, . . . and the details of the interrogation, including the conduct of the police." Commonwealth v. St. Peter, 48 Mass. App. Ct. 517, 519 (2000). See Commonwealth v. Welch, 487 Mass. 425, 438 (2021). "The Commonwealth bears the burden of proving beyond a reasonable doubt, in the totality of the circumstances, that a defendant's waiver was voluntary, knowing, and intelligent, and that his statements were voluntary." Commonwealth v. Auclair, 444 Mass. 348, 353 (2005).

Having conducted an independent review of the recorded interview, we agree with the motion judge that the defendant's waiver and statements were voluntary beyond a reasonable doubt.

---

[13] During the interview, the defendant asserted that could not answer the detectives' questions about his earlier activities because he had been "trippin' balls all day" on marijuana and crystal methamphetamine.

The defendant is a high school graduate and had completed one year of college. Although he at times appeared lethargic, his responses were coherent, consistent, and even calculated. His repeated assertion that he did not understand what he was doing in the police station was not a statement about his orientation with respect to place, time, or situation, but rather had to do with the quantum of evidence the police had against him. His comments regarding smoking marijuana tainted with crystal methamphetamine pertained to his alleged lack of memory of the events that took place earlier that day, not his inability to engage in a conversation.[14] "[T]he mere influence of drugs or alcohol on the defendant will not transform otherwise voluntary statements into involuntary ones." Welch, 487 Mass. at 439. "[T]he defendant was not demonstrating confusion" during the interview, Commonwealth v. Rivera, 482 Mass. 259, 267 (2019), and it does not appear that his waiver or statements "are attributable in large measure to [his] debilitated condition," Commonwealth v. Bell, 473 Mass. 131, 141 (2015), cert. denied, 579 U.S. 906 (2016), quoting Commonwealth v. Allen, 395 Mass. 448, 455 (1985). To the contrary, his comportment and behavior

---

[14] We note that the recorded interview took place approximately five hours after the defendant was first apprehended, and any use of substances must have occurred prior to that time.

"indicate a rational understanding of the situation and a voluntary decision to speak to police." Bell, supra at 142.[15]

B. Authentication of letter from jail. The defendant contends that the trial judge erred in admitting, without sufficient authentication, the handwritten letter received by Constant's mother. To admit the letter in evidence, the judge had to make a preliminary determination that the jury could find it more likely than not that the defendant was the author. See Commonwealth v. Purdy, 459 Mass. 442, 447 (2011); Commonwealth v. Johnson, 102 Mass. App. Ct. 195, 200-201 (2023); Mass. G. Evid. §§ 104(b), 901(a) (2022). "In the context of written letters, where a witness has received a letter and cannot identify the writer's handwriting or signature, evidence that the writer identified himself as a particular individual is not sufficient to authenticate the letter." Purdy, supra at 449. However, "where other confirming circumstances are present, a letter can be authenticated and properly admitted in evidence" (citation omitted). Id. Authentication of an item may be

---

[15] As the motion judge, acting on the defendant's motion to suppress, reviewed the recorded interview and ruled on the defendant's claim that his Miranda waiver and statements were involuntary, there was no need, as the defendant contends, for the trial judge to conduct a second voir dire on the same issue prior to admitting the recorded interview in evidence. See Bryant, 390 Mass. at 745. In addition, the trial judge gave a "humane practice" instruction contemporaneously with the admission of the interview and again in the final charge.

proved by the contents of the item itself. See id. at 447-448, quoting Mass. G. Evid. § 901(b)(1), (4) (2011) ("Evidence may be authenticated by direct or circumstantial evidence, including its '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics'"). See also Welch, 487 Mass. at 441 (confirming circumstances included content of text messages, "replete with details of the defendant's and the victim's lives, including the tensions within their relationship, aspects of their living arrangements, and the suspension of the defendant's driver's license from his [operating while under the influence of alcohol] charge"); Commonwealth v. Siny Van Tran, 460 Mass. 535, 547 (2011) (airline documents authenticated by their use of "several distinctive internal codes"); Commonwealth v. Gilman, 89 Mass. App. Ct. 752, 759 (2016) (electronic communications authenticated by evidence that "the conversations were replete with personal references, including pet names the defendant and victim used for each other, and references to events in which the two alone participated").

Abundant confirming circumstances were present here. The letter was mailed from the Nashua Street jail, where the defendant was being detained prior to trial, and his name was handwritten in the return address corner of the envelope. The letter contained details that only someone familiar with the

facts of the murder would know. The author referred to Constant and Hunter by name and stated that the assault originated in Hunter's bedroom, that Hunter hit him on the back of the head with a spatula, and that he used "a kabar pocket knife." The judge did not abuse her discretion in finding sufficient confirming circumstances that would allow the jury to determine, by a preponderance of the evidence, that the defendant wrote the letter.[16]

C. Defendant's medical records. The defendant also argues that the trial judge abused her discretion in excluding medical records regarding his two-week admission to Carney Hospital, six months before the murder, for what the records describe as a "psychotic break associated with significant aggression." The records of that admission also state that the defendant experienced "auditory hallucinations and paranoia" and that his history was "complicated by marijuana usage." At the final pretrial conference, the defendant argued that the evidence could be relevant to his ability to form the requisite intent for deliberate premeditation and extreme atrocity and cruelty. The judge granted the Commonwealth's motion "to preclude testimony about any alleged mental health diagnosis of

---

[16] When the letter was admitted, the judge instructed the jury that it was for them to decide whether the letter came from the defendant.

defendant," reasoning that the records in question were not relevant because the defendant had not made any showing or proffered any evidence that he was suffering from the same mental condition at the time of the crime.[17]

The records were excluded in the context of a trial for murder in the first degree. Any new trial will be on a charge of murder in the second degree. See note 11, supra. As the evidence of the defendant's prior mental illness may have different relevance at any new trial, and as it was excluded based on the deficiencies of the defendant's particular showing at the time of the first trial, we decline to address whether the trial judge abused her discretion in excluding the records. Before any new trial, the defendant is free to renew his attempt to introduce relevant, admissible evidence of his mental health status prior to the murder.

Judgments reversed.

Verdicts set aside.

---

[17] As the Commonwealth correctly notes in its brief, the defendant had previously waived the defenses of lack of criminal responsibility and diminished capacity in open court, and at the final pretrial conference he made no reference to calling a mental health expert at trial; the judge's ruling, therefore, related only to medical records.